**WESTINGHOUSE ELECTRIC CORPORATION**

v.

**The GARRETT CORPORATION.**

**Civ. No. 73–887–B.**

United States District Court, D. Maryland.

Aug. 30, 1977.

John E. Vanderstar, John R. Bolton, and Covington & Burling, Washington, D.C., Donald E. Sharpe and Piper & Marbury, Baltimore, Md., for plaintiff.

Benjamin R. Civiletti, John Henry Lewin, Jr., George C. Doub, Jr., and Venable, Baetjer & Howard, Baltimore, Md., for defendant.

BLAIR, District Judge.

## INTRODUCTION

This is an action on a contract for the sale of goods brought by the buyer (Westinghouse) to recover the amount paid in excess of the contract price to procure the contract goods after the seller (Garrett) allegedly defaulted and consequently was terminated by the buyer. The seller counterclaims, charging that the termination was wrongful and that it may therefore recover its costs. By agreement of the parties the case was bifurcated for separate trials of liability and damages. The case has now been ably tried and briefed at length by counsel for both sides on the issue of liability. The court's findings and conclusions on that issue follow.

## FINDINGS OF FACT

1. The plaintiff, Westinghouse Electric Corporation, is a Pennsylvania. corporation with Aerospace and Electronic Systems Division facilities located at Baltimore, Maryland.

2. The defendant, Garrett Corporation, is a California corporation with its offices in the State of California.

## I.

### *Technical Background*

3. An Electronic Counter Measure (ECM) pod is a device attached to combat aircraft to counter enemy radar tracking devices. Its function is to jam or confuse enemy antiaircraft radar defense systems so that those systems "locate" an aircraft at a different (and incorrect) place. By thus deceiving the radar, the ECM pod causes enemy fire reliant on that radar to miss the aircraft.

4. The ECM pod concept has been in use and under further development since the 1950's through the present date.

5. The electronic equipment used to confuse ground radar (primarily "TWT's" or "traveling wave tubes") and the power supplies required to operate such equipment generate large amounts of heat as they function. ECM pods thus require cooling to prevent heat from impairing the operation of the pod electronics. Airborne cooling systems used in ECM pods operate by causing heat from the electronic components to be transferred by conduction to a fluid (the "coolant"). Early ECM pods utilized an "open-loop" system: once the coolant had picked up heat, it was expelled from the pod into the airstream. Using an open-loop" system, therefore, an ECM pod can operate only as long as the reservoirs within the pod contain coolant.

6. The pod program involved in this case was designated "QRC–522." "QRC" stands for "quick reaction capability" and is a concept peculiar to the electronic warfare aspects of our national defense. QRC programs are designed to permit the Air Force to procure highly complex systems rapidly and to make fast decisions at low management levels in order to counter more quickly new enemy "threats" (for example, new enemy radar).

7. In mid-1972 the nomenclature was changed to "AN/ALQ–119." "AN" stands for "Army-Navy"; "ALQ" stands for "airborne electronic countermeasure." AN/ALQ–119, ALQ–119 and QRC–522 are used interchangeably hereinafter.

8. In order to accommodate changes desired by the Air Force to increase the effectiveness of its ECM pods while maintaining size, weight and power restraints, the QRC–522 program required the design of a dual "open-loop" and "closed-loop" cooling system. In a "closed-loop" system, the coolant would not be expelled from the pod after it had been heated, but would itself be cooled by transferring the heat it had absorbed to the airstream. The coolant would then be returned to the system to repeat the cycle.

9. A QRC–522 pod is divided into three cylindrical modules ten inches in diameter and of varying lengths: the Service Module, about 25 inches long, and Modules A and B, which are about 38 and 68 inches long, respectively. Within each module, bisecting the cylinder throughout its entire length, is a component called a "cold plate" assembly, consisting of two individual cold plates and a frame to which they are joined. The cold plates themselves (two for each module, or six for each ECM pod) are made up of many small, finned, aluminum passageways, through which the liquid coolant flows. Electronic components are mounted to the outside of the cold plates, primarily those in the A and B modules. The heat these components generate is conducted through the surface of the cold plates and absorbed by the coolant, which flows through the internal fins under pressure created by a pump attached to the Service Module coldplate assembly.

10. In the closed-loop phase after the coolant (known as Coolanol 20 for the ALQ–119) has absorbed the heat from the electronic components, it passes to the aerodynamic surface heat exchangers (ASHX's). These ASHX's are mounted on the outside skin on each side of the A and B modules of the pod. They also contain fins through which the coolanol flows, and additional coolanol flows through a passageway in the outer skin of the ASHX's. Air flowing past the pod is drawn into the ASHX's. The heat in the coolanol is transmitted by convection to the passing air, and the now-cooler coolanol returns to the cold plates to absorb more heat from the electronic equipment in a continuous cycle. There are two

ASHX's on Module A and two on Module B; there are no ASHX's on the Service Module.

11. Reservoirs, or accumulators, in the coolanol line take care of coolanol volume losses and also, because they are spring loaded, maintain a constant pressure in the line.

12. In the "open-loop" phase of the ALQ–119 cooling system, the space between the two cold plates and within the frame in each module is utilized as a "water boiler." For limited periods of time and under certain flight, mission, and climatic conditions, the closed-loop system was expected to be unable to provide sufficient cooling capacity. Upon proper automatic triggering by a heat-sensitive diverter valve, the coolanol is diverted from the ASHX's and flows instead to an enclosed passage that runs through the water contained in the water boilers. This permits the water to absorb the heat, boil at fixed temperature ranges and be expelled through the automatic pressure-reduction devices (sometimes called "steam vents").

## II.

### Contractual Background

13. The procurement cycle for the QRC–522 ECM pod began in 1970.[1] Garrett as of that time had many years experience designing and fabricating devices and systems for the temperature conditioning of airborne electronics, including over ten years of general acquaintance with the subject of closed-loop cooling systems. Although Garrett had no significant experience with the

design and production of cooling systems for ECM pods, it had early in 1970 made a theoretical study of a closed-loop cooling system under a contract with Westinghouse and submitted a report on February 17, 1970.

14. Westinghouse decided to buy most of the components for the QRC–522, including the cooling system. Although Westinghouse had manufactured in-house the open-loop cooling system for the predecessor pod, it decided to buy rather than make the cooling system for the QRC–522 because it believed it lacked the necessary manufacturing technology, notably the capability to braze the aluminum fins to the cold-plate surfaces. Consistent with normal practice, Westinghouse prepared a make-or-buy plan[2] for the QRC–522 which was submitted to and approved by the Air Force when it placed the 20-lot contract.

15. In the summer of 1970, Westinghouse began the formal procurement cycle on the cooling system by issuing a series of Requests for Quotations (RFQ's) to potential subcontractors, including Garrett, for a prototype or "breadboard" model and 20 production systems. The specifications on which bids were sought were set forth in an "R–Spec" bearing the number R–A2A1A1. The term "R–Spec" means "requirement specification" and is used by Westinghouse to denote specifications for components in their developmental stages. As development progresses the R–Spec is revised. Successive revisions are alphabetically designated beginning with Revision A (Rev A).

1. An earlier Westinghouse ECM program began in 1967. It was developed specifically for the Air Force and involved the problem of protecting aircraft engaged in the Southeast Asian war. This program was designated ALQ–101 or QRC–335. It went through various modifications, at the conclusion of which Westinghouse had delivered an aggregate of approximately 400 ECM pods to the Air Force. All the ECM pods in the QRC–335 series contained open-loop cooling systems which Westinghouse fabricated in-house. Once all of the water in the open-loop cooling system had boiled off, the equipment in the ECM would begin to heat up and would turn itself off.

2. A prime Government contractor must make a "make-or-buy" decision, i. e., a decision as to

which parts or components of the item under contract will be manufactured by the prime contractor and which will be purchased from outside sources. As required by the Armed Services Procurement Regulations (ASPR), the make-or-buy decision at Westinghouse is made by a formal committee of top-level managers (from manufacturing, purchasing and other departments) and the results are submitted to the Government, together with the names of vendors and subcontractors, for approval. The Armed Services Procurement Regulations (codified at 32 C.F.R. Parts 1–39) form a comprehensive regulatory regime governing most contracts between private companies and the Department of Defense. These regulations contain, inter alia, standard contract clauses includable in Government contracts.

16. On September 18, 1970, Westinghouse executed a prime contract with the Government to supply 20 QRC–522 pods.

17. Thereafter, Westinghouse issued the third revision (Rev C) to the cooling system R–Spec and solicited fresh bids. By this time, five of the seven companies to whom the initial RFQ was sent had been eliminated from consideration as possible vendors, either because Westinghouse had determined them to be technically incompetent or because they had chosen not to bid. There were thus only two bidders remaining as competitors, Garrett and United Aircraft Products, Inc. (UAP), a much smaller company located in Dayton, Ohio (and not related to United Aircraft, a major airplane manufacturer). The final bids of the two companies, dated October 28, 1970, were as follows: Garrett bid a total price of $241,-971, composed of $7,185 for each of the 21 systems plus $91,086 for "nonrecurring engineering costs" (which provides reimbursement for design effort and other preproduction work); UAP bid $207,493, composed of $7,700 for each of the 20 production systems plus $30,493 for nonrecurring engineering

and the breadboard model, and $23,000 for data, tooling and testing.[3]

18. Following receipt of these bids, Westinghouse on October 29, 1970 issued an Authorization to Proceed to UAP based on the R–Spec, Revision C.

19. On March 8, 1971, Westinghouse and the United States Government executed a prime contract providing for the production by Westinghouse of 281 more ECM pods to be delivered to the Air Force although no pods had yet been received by the Air Force pursuant to the 20-lot prime contract. Delivery dates for ECM pods under the 281-lot prime contract were as follows: 4 pods to be delivered in September 1971; 11 pods to be delivered in October 1971; 18 pods to be delivered in November 1971; 25 pods to be delivered monthly thereafter until September 1972 when the last 23 pods were to be delivered.

20. On January 6, 1971, prior to the execution of the prime contract, Westinghouse issued RFQ's to Garrett and UAP incorporating a specification identified as "R–A2A1A1 Rev. E Plus Current Changes." The RFQ requested prices for various num-

---

**3.** Earlier bids to various RFQ's on cooling systems for the 20–lot contract were as follows:

| Date | Company | Cooling System Prices |
|------|---------|----------------------|
| RFQ JJS: 70–35, 70–36 (Rev. B of the R–Spec) | | |
| July 16, 1970 | Garrett | $17,449.70 per unit<br>$123,575.70 nonrecurring<br> engineering costs |
| July 16, 1970 | UAP | $8,489 per unit<br>$45,423 preproduction cooling<br> system plus nonrecurring<br> engineering costs |
| RFQ–JJS: 70–44 (Rev. C of the R–Spec) | | |
| August 24, 1970 | Garrett | $9,854 per unit<br>$108,947 nonrecurring<br> engineering costs |
| October 5, 1970 | Garrett | $8,453 per unit<br>$107,160 nonrecurring<br> engineering costs |
| October 7, 1970 | UAP | $8,390 per unit<br>$25,862 preproduction cooling<br> system plus nonrecurring<br> engineering costs |

bers of cooling systems including a 281-unit lot. The RFQ set forth a schedule of required delivery dates with delivery of the first systems to be in July 1971.[4]

21. To provide the "current changes" noted in the January 6 RFQ, Westinghouse held a meeting with Garrett representatives on January 20, 1971. Sketches of cold-plate hole patterns and a "footprint" of heat load patterns were provided, along with other technical information. Garrett had a copy of Rev E, and that too was discussed. Contractual information to supplement the RFQ was supplied by letter dated January 11, 1971.

22. In response to the January 6, 1971 RFQ, Garrett on January 27, 1971 bid on the 281-lot $6,968 per unit and $91,086 nonrecurring engineering costs for a total contract cost of $1,958,008; UAP on January 28, 1971 bid $8,007 per unit for a total contract cost of $2,249,967. No nonrecurring engineering costs were identified in the UAP bid because UAP had incurred the nonrecurring engineering costs under the 20-lot subcontract. Garrett proposed to begin delivering units 90 days after receipt of an order.

23. On April 2, 1971, Westinghouse requested UAP to update its quotation, and in response on April 16 UAP quoted $8,955 per unit for 281 units.

24. On April 28, 1971, Westinghouse issued another RFQ to Garrett, this time for 250 systems.[5] In response to this RFQ, Garrett on May 11, 1971, referencing R–Spec, Revision E, Garrett's July 1970 proposal and one other technical paper, pro-

posed a per unit price of $6,190, and total nonrecurring engineering costs of $91,086 for a total subcontract cost of $1,890,860. Delivery of the first unit was set at 90 days after order, increasing to delivery of 30 systems per month by the fourth month of deliveries.

25. In late March or early April 1971 Westinghouse also initiated formal steps looking toward preparation of a more definitive specification to replace the R–Spec. Such a specification, called a Purchasing Department Specification, or "PDS," is prepared by a special support group, the Configuration Engineering section's Parts Engineering group. The QRC–522 cooling system PDS was designated PDS 21780.

26. Whelan, an engineer in the Westinghouse Parts Engineering Group who specializes in complex systems, was responsible for preparing the PDS and he began work on the project in mid-April, 1971. Except for the normal request that it be done "right away," he had no specific deadline for completion of the PDS. His work included review of the R–Spec, collection of additional information from Demske and other Westinghouse engineers, analysis of the design criteria, and drafting of the PDS itself, which in its completed form [P. 6][6] contains forty-five pages of closely written text plus sketches, diagrams and other information.

27. In early May Whelan was asked to run off a copy of the partially completed PDS, as it then stood. This was given to UAP on or about May 5 to compare with the specifications it was working to under the 20-lot contract.[7]

---

**4.** The January RFQ issued to Garrett gave a first delivery date of July 1971 but did not state when the order would be placed. Thus it did not specify how much lead time was being allowed before the first delivery.

**5.** The reason Garrett had been asked to bid on only 250 units related to Westinghouse's interest in keeping both UAP and Garrett available as sources. Westinghouse hoped that if Garrett won the 250-lot contract Westinghouse could contract with UAP for the additional 31 units, plus about 30 "spares," to be manufactured after UAP completed the 20-lot procurement. Westinghouse also hoped that the timing of the next pod procurement would permit it to order more cooling systems from UAP and

Garrett while they were still in production under the present contract, thus permitting uninterrupted manufacturing operations.

**6.** The parties' exhibits are herein designated "P." or "D." for plaintiff or defendant as the case may be, followed by the exhibit number. Transcript page references will be preceded by "Tr.". Occasional references will also be made to the parties' proposed findings of fact. These are abbreviated "PPF" and "DPF" followed by the appropriate number.

**7.** The record does not show whether UAP made such a comparison or, if it did, what conclusions were reached; nor does the record

28. On May 6 UAP bid $2,304,200, stated at $8,200 per unit for 281 units; there was to be no nonrecurring charge, as UAP was proposing to build what it was already manufacturing under the 20-lot contract. On May 10 UAP reduced the per unit price to $7,500 (for a total price of $2,107,500), with first delivery fixed for 16 weeks after receipt of order. On May 12, however, UAP withdrew its outstanding bid because it was "reviewing the entire program." Then, on the morning of May 13, 1971, UAP submitted by telephone a bid of $10,500 per unit for the 281-lot subcontract with six units to be delivered 21 weeks after receipt of the order.[8]

29. Upon receipt of Garrett's May 11 bid, Westinghouse invited Garrett to a negotiating session at Baltimore, to begin on Monday, May 17, 1971. The invitation was made through Sullivan, the Garrett sales representative in Washington. Garrett expected to be considered as a second source for QRC–522 cooling systems.

30. On Friday, May 14, a draft of the PDS as it then stood was flown to Los Angeles. Miller, an analytical design engineer who had been involved in the project since mid-1970, picked the PDS up at the L. A. airport, reviewed it and called Breaux, a senior engineer who had also been involved in the project since mid-1970 and who was to head the Garrett design effort, to say that because of its incompleteness he believed a joint review of the draft would be of no value.

## III.

### The Negotiations

31. The contract negotiations between Garrett and Westinghouse lasted approximately three days, from May 17 to May 19, 1971.[9] Representatives of the two companies met at Westinghouse's Baltimore facilities.

32. The Garrett negotiating team was headed by Morgan, a former engineer who then was sales manager of Garrett's AiResearch Division's Heat Transfer Department. Besides Morgan, Garrett was represented by Breaux, Miller, Sullivan, and Lane, a drafting-room coordinator and design engineer.

33. The Westinghouse team varied during the three days of meetings. In charge was Schoolden, a subcontract specialist (buyer) in the Westinghouse purchasing department (and not an engineer). Whelan was also present much of the time. Other Westinghouse engineers attended from time to time, including Mentzell, a supervisory mechanical design engineer, Fox, the QRC–522 Program Manager, and Denton, an engineering manager.

### A. Specification Review

34. When Garrett's representatives arrived at Westinghouse on Monday, May 17, they received a nearly finished edition of the preliminary PDS. This version [P. 5] was 95 percent complete; only certain numerical performance values and minor aspects of various specifications had not yet been written in.

35. On May 17 and 18, Whelan conducted a paragraph-by-paragraph review of the preliminary PDS with Breaux and Miller, the Garrett engineers. Essentially, he read each paragraph aloud and made comments and answered questions as he read. He also provided the Garrett engineers orally with some of the detailed specification information not yet contained in the written PDS. Whelan promised to supply all missing in-

---

show exactly to which specifications UAP was designing under the 20-lot contract.

8. UAP was undergoing a management change around the time it withdrew its outstanding bid to review the program. The record is inconclusive both as to Westinghouse's proposed inference that the withdrawal was a management problem and as to Garrett's proposed inference that it indicated serious technical difficulties (evidenced by the May 13 bid increase) of which Garrett was kept largely uninformed.

9. The witnesses' recollections varied as to what occurred on which day during the May 17–19 meetings. Where possible, the court's findings of fact reflect the date on which a given event occurred. Events not allocable to a specific date are merely characterized as having occurred sometime during the May 17–19 meetings. In any event the chronology of the May 17–19 meetings is not generally of significance.

formation promptly and to have the completed PDS formally issued (or "released") within a week (which was in fact done).

36. The PDS is on its face very different from Rev E of the R–Spec. Not only is it much longer and more detailed, but a number of the specifications are different and several are more demanding. During the extensive May 17–18 review the differences between the PDS and Rev E of the R–Spec became apparent to Breaux and Miller, who were familiar with Rev E and the supplementary specification information Garrett had received since publication of Rev E.[10] Two of those differences were the subject of extensive discussion between the two companies: the three-piece cold-plate assembly and the aerodynamic surface heat exchangers.

37. *Three-piece cold-plate.* As explained previously, what is sometimes called the "cold plate" is in reality two cold plates bolted to a separate frame; this structure is properly described as a cold-plate *assembly.* The R–Spec had not specifically required this three-piece structure, and Garrett, in the 20-lot bidding, had proposed a one-piece structure in which the two cold plates were not dismountable from the frame. UAP, however, designed and built a three-piece cold-plate assembly. This would be easier to maintain and less expensive to repair (especially in the event of corrosion of an inside face of one of the removable cold plates, a major problem on the earlier QRC–335 systems) since only the damaged plate and not the whole assembly need be replaced. A three-piece assembly was thus desirable despite its higher cost of manufacture.

38. The three-piece requirement is expressly set forth at paragraph 3.2 of both the preliminary and the final PDS 21780 [P. 5; P. 6]. Although the Garrett engineers did not spot the three-piece cold-plate assembly requirement in the preliminary copy of the PDS they received on May 14, they, of course, became aware of it at the May 17 PDS review.

39. *"Ducted" ASHX.* In the 20-lot bidding, both UAP and Garrett had proposed an ASHX on which the fins (which carried the hot coolanol) would be open to the airstream. During the development stage, however, UAP persuaded Westinghouse that a "ducted" ASHX, that is; one which had a thin cover over the fin tips, would be preferable. The cover could be used as an additional coolanol passage, thus increasing exposure to the airstream; aerodynamic factors were apparently also involved, but they are not developed in the evidence.

40. The ducted requirement is set forth in paragraph 3.6.12 of the preliminary and final versions of the PDS. [P. 5; P. 6]. Like the three-piece cold plate this change was not spotted by the Garrett engineers in the May 14 PDS, but did become known to them on May 17.

41. Breaux and Morgan expressed doubt that the proposed design of the surface heat exchanger was adequate to meet the performance specifications. Mentzell replied that UAP had wind tunnel test data establishing that the open-fin configuration of the surface heat exchanger should be replaced by the ducted configuration. Mentzell also stated that he would attempt to obtain documentation of such wind tunnel tests for Garrett. Westinghouse had no reason beyond Garrett's doubts to believe that the UAP configuration would not meet the specifications.

42. After adjourning for lunch on May 17 the Garrett engineers left Westinghouse and spent several hours in their motel reviewing and discussing the preliminary PDS among themselves and on the telephone with others back at Garrett's main plant in Los Angeles. A major part of these discussions dealt with the differences between Rev E and the PDS, notably in connection with the "ducted" ASHX requirement.

43. A related topic of discussion at the May 17–19 meetings was UAP's progress on the 20-lot cooling system contract which was taking longer to perform than Westinghouse had anticipated. The original schedule called for delivery of the breadboard model by January 7, 1971, but UAP did not deliver that item until late March or

10. *See, e. g.,* P. 80.

early April. The first production system was due by March 18, 1971 but, although several different production components had been delivered by May 17, Westinghouse did not have a completely assembled pod until May 27. Accordingly, Westinghouse was only able to show Garrett the UAP breadboard. The breadboard as shown to Garrett did not include ASHX's.

44. During the meetings, Westinghouse disclosed to Garrett a number of specific difficulties UAP had been having in their performance under the 20-lot contract. For example, Garrett was told about UAP's pump freezing and power problems, about brazing problems at UAP's plant that caused cold-plate leakage, about the need to change overboard relief-valve settings to avoid leaking of coolanol, about a quick-disconnect interference problem, and about the need to maintain close tolerances where the ASHX mated to the pod. Garrett was also told what water volume UAP was achieving in each module.

45. There were a few problems with UAP's performance that were not discussed, such as UAP's difficulty in meeting the pressure drop requirements of the specification.

### B. *Source Control Drawings*

46. The PDS is the vehicle for providing technical specifications to prospective subcontractors. It does not normally define the "envelope" and "interface", that is, the space within which the cooling system components must fit and the points of interconnection with other pod components). This information is normally provided in "source control drawings." By requiring all vendors who manufacture these items to observe the same envelope and interface restraints, like components are made physically interchangeable no matter by whom manufactured. It is not required, however, that each manufacturer use all the allowed envelope.

47. Source control drawings (SCD's) provide some information relating to technical specifications as well as envelope and interface definition. And because they serve as inspection standards for components that could be manufactured by more than one vendor, some specifications listed on the drawings—such as the weight of individual components—may differ among the different vendors who are identified on the drawings as being authorized to supply the item.

48. There typically are no SCD's in an item's development phase, during which much of the envelope and interface information for a particular system or component is generated by the joint efforts of Westinghouse and the relevant subcontractor. Even during the development phase, however, with respect to an item such as the QRC–522 cooling system, most of the envelope and interface constraints must of necessity be dictated by Westinghouse since only Westinghouse knows how the entire pod fits together; Westinghouse must be sure that the parts supplied by each subcontractor interface without interference. The subcontractor's role is more one of feedback; if specifications cannot be met within the prescribed envelope and interface constraints, the subcontractor informs Westinghouse and adjustments are made to one or the other.

49. SCD's are generally prepared when development stabilizes. Their existence implies that a system conforming to their requirements has been built and operates to meet the specifications. Indeed, when coupled with a specification like PDS 21780 they define an entire system that can readily be produced.

50. SCD's are principally a format. The information contained in them can be conveyed by other methods. But they have the advantage of containing all the envelope and interface information (plus certain other information mentioned above) for a system or component thereof in one place, concise and organized. Production of a system is greatly facilitated by these drawings.

51. The May 17 PDS 21780 [P. 5] and the final PDS 21780 [P. 6] provide at paragraph 2 that certain documents "form a part of this specification to the extent specified herein." Subparagraph 2.2 of the PDS specifies five Westinghouse drawings designated as follows: 578R722, pumping unit and heat exchanger, cold plate (service

module cold plate); 578R725, reservoir, coolant, self pressurized (reservoirs); 578R726, heat exchanger, cold plate (Module A and B cold plates); 578R727, heat exchanger, aerodynamic surface (ASHX's); 578R737, vent, steam, aerodynamic pressure reducing (steam vent).[11] These are the source control drawings for the instant contract. The term "detail drawings" used in subsequent paragraphs of PDS 21780 is synonymous.

52. At the time of the contract negotiations with Garrett, Westinghouse had not yet prepared the source control drawings. UAP had, however, provided a set of ten "top-assembly" drawings. [P. 7–16]. These drawings show how each major component of the UAP cooling systems would look when assembled.

53. When the contract negotiations began on May 17, the Garrett engineers examined the ten UAP top-assembly drawings for a short time. Later that day or the next morning, Lane began to prepare free-hand tracings of certain of the UAP drawings, and Demske of Westinghouse traced others. Some time on May 18 it was decided that this would be too time-consuming; Garrett instead was simply given the UAP drawings, after Whelan had excised from them a small amount of material, thought to be the property of UAP (identifying data and some design details). Nothing was excised that Garrett needed to design the system.[12]

54. However, the top-assembly drawings did not contain all the envelope and interface definition Garrett needed. These drawings showed pictorially the UAP configuration, including the contours of many UAP parts. The drawings thus did not necessarily indicate the maximum available envelope but rather the envelope actually used by UAP. Source control drawings, by contrast, define the maximum available envelope.

55. The parties agreed that Garrett was entitled to use all of the envelope shown on the top-assembly drawings. If Garrett wished more space in areas where the UAP drawings showed what was obviously a peculiar feature of UAP's design, Westinghouse would give Garrett as much additional space as was available (that is, not taken up by non-cooling system components). Westinghouse thus gave Garrett not the maximum available envelope but the right to inquire and obtain that envelope if needed.

56. The UAP top-assembly drawings contained much interface information, such as locations of hose connections. Additional interface information was supplied in the form of three elaborate Westinghouse drawings [P. 17–19] showing precise locations of the hundreds of holes by which electronic and other components would be mounted on the cold plates; although the UAP drawings also contained mounting hole locations, Garrett was to look to the Westinghouse drawings as the primary source. Finally, Garrett received a drawing [P. 75] showing the flow of coolanol through the entire system, and a drawing [P. 20] showing how the pod was to be mounted on the aircraft.

57. In addition to the lack of complete envelope and interface definition the UAP drawings lacked a number of dimensions that were not provided in any form during the May 17–19 meetings. When, as will appear, source control drawings were not forthcoming, Garrett was forced to request specific dimensions as their absence was discovered.[13] Examples of missing dimensions include: (a) the clearance required at the top and bottom of the cooling system frames, (b) the size of recessed areas on the module A and B cold plates, (c) the location and available envelope of the diverter

---

11. The parentheticals are not in the PDS and are supplied for clarity and simplicity.

12. The UAP drawings that are in evidence [P. 7–16] are poor copies of the original, excised drawings supplied to Garrett; those were stolen before trial. Tr. 952.

13. Although Westinghouse urges in its reply brief that Garrett was told at the May 17–19 meetings to scale the UAP drawings to obtain missing dimensions, the court is not persuaded. Westinghouse did, however, later tell Garrett to do so. Finding 114, *infra*.

valve, (d) the coolant inlet fitting area at the aft end of module B, and (e) the location and the UAP configuration of the steam vent valve.

### C. The Delivery Schedule

58. Of particular concern to Westinghouse during the negotiations was the delivery schedule for cooling systems to be produced during the subcontract. Because the cold-plate assemblies had to be on hand before other pod components would be installed, the delivery dates of cooling systems were especially critical to the successful completion of the program. Westinghouse made it quite clear to Garrett representatives that completing the delivery schedule on time was of the highest priority to Westinghouse; the Westinghouse concern for meeting delivery schedules was well understood by both parties. Both parties also recognized that the delivery schedule was extremely tight.

59. In its May 11 bid [P. 40], Garrett had proposed to begin delivery of the first cooling systems 90 days after receiving the Westinghouse order. Because of Westinghouse's concern and interest in Garrett meeting the delivery schedule, Westinghouse representatives at the meeting took particular care to insure that Garrett in fact had the capability of meeting that schedule.

60. Because Breaux was directly involved only with the time for design work he needed to consult others at Garrett to determine manufacturing schedules. Accordingly, Breaux discussed the schedule by telephone with Garrett personnel in Los Angeles.

61. Someone at Garrett, although it is not clear who, decided that Garrett could deliver the first cooling system in 97 days. The schedule Garrett then proposed was to begin delivery on August 24, with four systems to be delivered in August, 20 in September, 30 in October and in November, and 35–45 per month thereafter. [P. 43]. To aid in demonstrating that this schedule would be met, Breaux prepared a "bar chart" [D. 343] showing the length of each

phase of the contract (for example, "design," "tooling," "fabrication," and "inspection") and also showing "milestones" or key points in the contract's progress. As further proof, the Garrett representatives identified the number of people who would be involved in the various phases of the program, such as development engineers, design engineers (draftsmen) and the like.

62. Impressed by this presentation, Westinghouse accepted Garrett's proposed schedule, which fit well with its own schedule for deliveries of completed pods to the Air Force.

### D. Design Review

63. The PDS provides at paragraph 3.18 that the vendor shall schedule a design review meeting prior to manufacturing but no later than thirty days after receipt of the order. Five days prior to the meeting the vendor is to furnish Westinghouse with, among other things, its manufacturing drawings. The meeting is held so that Westinghouse may review and approve the vendor's design from the point of view of overall system performance. Garrett informed Westinghouse that it would not be able to have its drawings ready in time and Westinghouse agreed to delay the design review accordingly.

### E. Engineer-to-Engineer Communications

64. Contracts such as the one involved in this case often contain special provisions permitting the imposition of changes in specifications or other contract terms in the midst of performance. Such a provision was incorporated in the Overriding Agreement Westinghouse and Garrett had executed in 1970 to apply to their contractual relations generally. Because of this, because of the incompleteness of the information furnished Garrett, because of the tight delivery schedule, and because the program was QRC, Garrett and Westinghouse agreed to take certain measures (not characteristic of the normal contractual relationship) to expedite the transfer of information between their respective engineering groups. There was to be "engineer-to-

engineer contact," with the paper-work confirmation to follow later. It was understood that when Westinghouse engineers communicated new information to Garrett engineers, Garrett would act on that information when it was received without awaiting the receipt by Garrett's contracts administrator of formal confirmation from the Westinghouse subcontract specialist.

65. In addition, the companies agreed that Westinghouse would send an engineer to Garrett who would be there full time until manufacturing was successfully underway. Stationing a resident engineer at a subcontractor's plant is unusual and indeed was prohibited in the Overriding Agreement between the parties but the short delivery schedule and the QRC nature of the subcontract led the parties to take this step to facilitate communication between them.

66. Although Garrett claims that Westinghouse promised to send an engineer capable of making on-the-spot decisions regarding questions about performance specifications or envelope and interface dimensions, this must have been a misunderstanding on Garrett's part. It was not feasible to detach one of the three or four most knowledgeable individuals from the main effort at Westinghouse to devote full time to one relatively small subcontractor's needs. In addition, it would have been extremely difficult for an engineer to be able to make final decisions if he had divorced himself from the rest of an ongoing program by moving to Los Angeles for several months.

### F. Price

67. Garrett had arrived at the price it had bid by having the relevant departments submit cost estimates to the Quotations Administration section. Breaux was responsible for the engineering cost estimate, which was reflected in one of the nonrecurring cost items ($91,086). Most of the total $1,809,860 bid on May 11 [P. 40] was in the manufacturing costs ($1,547,500 for producing the hardware and $78,358 for special tooling); these were the responsibility of other departments. Quotations Administration aggregated and analyzed the various estimates and the Division management applied the appropriate management strategy and derived the price given to the customer.

68. There were other communications between Garrett's representatives in Baltimore and its Los Angeles staff besides the motel room review conversations on the afternoon of May 17. Among the subjects discussed were the cost impacts of the three-piece cold plate and the ducted ASHX. Garrett personnel at Los Angeles, who included Tyce, the manufacturing manager, told Garrett's Baltimore team that the three-piece cold plate requirement would increase manufacturing costs; Los Angeles also concluded, after a hasty review, that the ducted ASHX approach would save on manufacturing costs and indeed that these savings would roughly offset the projected increase caused by the change to a three-piece cold-plate. Garrett thus at the outset stood by its May 11 bid despite these technical differences.

69. Westinghouse believed, however, that Garrett's May 11 bid was roughly $185,000 above the price the Westinghouse Purchasing Department hoped to reach. Price negotiations ensued and Westinghouse asked Garrett to reduce its total price by $200,000.[14] Morgan telephoned Garrett

---

14. Garrett argues that Westinghouse told Garrett it was $200,000 "higher than the competition," i. e., UAP. The court is not convinced that Westinghouse actually put it this way; rather, some Garrett personnel probably interpreted it this way. The facts are more consistent with the Westinghouse version and the court's finding. If Westinghouse sought Garrett as a "second source" (see Findings 72–73, infra) as Garrett believed, Garrett and UAP would not be in a strictly competitive situation. Westinghouse would be looking for a bid that would make it worthwhile to have Garrett as a second source; such a bid would of course have to be reasonably competitive but not necessarily under the competition.

These considerations point out a minor inconsistency in Garrett's position. Garrett's witnesses testified that they believed Garrett to be in head-to-head competition with UAP for

management personnel in Los Angeles, and he was authorized to lower Garrett's bid by approximately $100,000, which he did. Half of that reduction was reflected in a decrease in the cooling system per-unit price to $6,000 each (for 250 systems) and the other half by reducing the nonrecurring qualification testing figure from approximately $75,000 to approximately $25,000. The total figure then came to $1,743,907. This bid was accepted by Westinghouse.[15]

70. Not surprisingly, UAP's difficulties under the 20-lot contract resulted not only in the delivery delays already noted, but in cost problems. Although these problems apparently were not discussed at the May meetings, they were known to Garrett which routinely kept abreast of developments in its field and specifically kept abreast of UAP's progress.[16]

71. Westinghouse did not disclose that UAP's last bid on the 281-lot procurement was substantially higher than Garrett's despite UAP's greater experience with the system as a result of its work on the 20-lot contract. Although the record demonstrates that Garrett was generally aware of UAP cost increases, it does not appear that Garrett was aware of the magnitude of UAP's May 13 bid.

### G. The Parties' Expectations

72. Both Westinghouse and Garrett believed that the subject contract was intended to develop Garrett as a second source for QRC–522 cooling systems. Being a second source implies several things. One is that the part or system being supplied has already been built by a first source and development is reasonably stable. In other words, a second source is typically a source of supply and not development.

73. Moreover, the part or system supplied by a second source typically must be interchangeable with that of the primary source. Systems manufactured by two different suppliers may be interchangeable at different levels. For example, only the final assembled systems might be interchangeable, each part or component might be interchangeable, or sub-assemblies (something less than the whole but greater than the individual parts) might be interchangeable.

74. Westinghouse required that the Garrett cooling system be interchangeable in "form, fit and function" with the UAP 20-lot system at the "line replaceable unit" level, essentially a sub-assembly level. Ten components were to be interchangeable; they may be generally characterized as: (a) reservoirs, (b) Service Module vent, (c) ASHX's, (d) Module A cold-plate assemblies, (e) Module B cold-plate assemblies and (f) Service Module assemblies.

75. The interchangeability requirements further suggested to Garrett (in addition to being a second source) that development had stabilized. With UAP presumably in production changes in form, fit and function would be unlikely.

76. A related problem is whether this was a production or development contract. In a development contract the vendor undertakes to produce something never before made; it may or may not include an undertaking to make advances in the state of the art (that is, an advance in what is known to be technologically possible). The UAP 20-lot contract was a development contract. In a production contract, in its pristine form, a vendor merely builds something it has built before. It has all the drawings, specifications and tooling prepared. The quantities ordered under development contracts are generally quite small whereas a production run may be quite substantial.

77. Between these two extremes are numerous hybrids. The instant case involves primarily a production contract in that the system had ostensibly been built before (by

the 281-lot subcontract, but the evidence also indicates Garrett believed Westinghouse sought it as a second source in which case, as noted; Garrett and UAP would not be in an ordinary competitive situation.

15. The Garrett subcontract represented about four percent of the total Westinghouse investment in the 281-lot contract.

16. See, e. g., P. 80.

UAP), it was to be built to a PDS referencing source control drawings, it was supposedly within the state of the art, interchangeability was required, and the quantity was a production lot quantity.

78. However, because the system had never been built before by Garrett, Garrett had substantial design responsibilities. Within the available envelope and subject to interface constraints Garrett was to *design* as well as fabricate cooling systems that met the specifications set forth in PDS 21780.

79. Garrett believed from all these circumstances that the development of the QRC–522 cooling system had stabilized, thus making feasible its proposed 97-day delivery schedule. In fact, although Garrett did not know it, Westinghouse delayed in awarding the cooling system subcontract for this very reason; although Westinghouse had been awarded the prime contract for the 281-lot procurement on March 8, it did not award the cooling system subcontract until the latter half of May so that development could stabilize and a PDS could be prepared.

80. But because of its design responsibilities and the tightness of the schedule, Garrett needed the source control drawings promptly. In fact, Garrett's proposed delivery schedule was dependent on obtaining the drawings in a reasonable time. Garrett fully and reasonably expected the SCD's to be finished in time to work from them.

81. Garrett argues that at the May 17–19 meetings Westinghouse promised to deliver the drawings within a week. The Garrett personnel must have misunderstood Whelan's promise to deliver the completed *PDS* in a week (about which there is no dispute) to refer also (or instead) to the *SCD's*. But Whelan had not yet begun the SCD's. In order to complete work on the PDS within a week, as he promised, Whelan was in effect saying he would be working primarily on that task. He therefore could not devote any substantial time to the SCD's. It is doubtful an engineer of his competence would make the promise asserted.

82. Nevertheless, Garrett believed or came to believe, as will appear more fully hereinafter, that the source control drawings had been promised within a week. Garrett was not aware that they had not even been begun at the time of the May 17–19 meetings.

83. While not stating exactly when the source control drawings would be forthcoming, Westinghouse *never* said they would not be forthcoming, *never* said it was not obligated under the contract to deliver them, and *never* said that the UAP and other drawings furnished on May 17–19 were intended to be a substitute for the SCD's. Garrett fully believed the drawings furnished at the May meetings were an interim measure.

## IV.

### *Performance up to July 21, 1971*

84. Having decided to accept the revised Garrett bid, Westinghouse issued an Authorization to Proceed on May 19, 1971 [P. 45], which was handed to Breaux at Westinghouse on that date; because of a typographical error Schoolden sent a corrected TWX on May 20 [P. 46], which is exactly the same as P. 45 except for the correction. As the Authorization to Proceed indicates, separate purchase orders were to be issued for nonrecurring tooling and nonrecurring data. Upon receipt of the Authorization to Proceed, Garrett was to begin work under the cooling system subcontract.

85. On Friday, May 20, Garrett began work on the contract by holding a "kickoff meeting," at which the various tasks were reviewed and divided up among the members of the design team. Breaux was in charge.

86. Lead designers, under Lane, promptly began making rough layout drawings, which show the approximate area available for the performance of the heat-transfer functions. These Garrett drawings were then used by the preliminary design group, under Miller, in determining how in general the heat-transfer requirements in the PDS would be achieved within the available

space. The results of these analyses would then be used by other Garrett engineers in creating the design for which Garrett was responsible under its contract.

87. Meanwhile, Whelan had observed the results of certain tests that had been conducted on the UAP breadboard model and passed that information, as well as other specification details, to Breaux and Miller by telephone. Whelan also completed preparation of the PDS that had been reviewed in nearly-complete form on May 17 and 18, and the final PDS was "released" and sent to Garrett on May 26.

88. Over the course of the next four or five weeks, engineers at Westinghouse (mainly Whelan and Demske) held numerous conversations, chiefly on the telephone, with Garrett engineers (mainly Breaux, Valentino, Garrett's Program Engineer, and Miller) pursuant to the engineer-to-engineer line of communication established at the contract negotiations. The exchange of information was facilitated by the stationing at Garrett of John Nolan, a Westinghouse engineer, pursuant to the parties' agreement at the May negotiations.

89. One noncontroversial area of engineer-to-engineer communications was specification clarification. The need for such contacts was fully expected by both sides and was one of the reasons for stationing Nolan at Garrett.

90. Garrett occasionally requested relaxation of the specifications and envelope enlargements. A request for specification relaxation might be wholly distinct from envelope needs—for example, Garrett's request that it be allowed to use more power for its pump. Frequently, however, the two were interrelated. Garrett would contend that it was impossible to meet the specifications within the available envelope; one or the other had to give. Two examples that were the subject of contention are the steam vent valve and the ASHX's.

91. The purpose of the steam vent valve is to ensure that the pressure in the water boiler does not fall below 8 pounds per square inch. (If the pressure fell too low water would boil at too low a temperature and would boil off too soon.) Pressure in the water boiler tends to increase with temperature. Under the PDS, when the pressure ran to 8 pounds per square inch, the valve was to open and permit steam to flow from the water boiler. The UAP drawings did not contain sufficient dimensions to enable Garrett's engineers to determine either the required location of the valve or the configuration of the UAP valve.[17] Even without these dimensions it was the belief of Garrett's valve designer, Greeven, that the specifications could not be met using the UAP configuration as depicted on the top assembly drawings. This was confirmed when Westinghouse orally supplied Garrett with the dimensions on June 8 and confirmed them with a sketch on June 16. Greeven requested that his superiors obtain additional envelope in order that a valve could be designed that would satisfy the specification requirement that it not trap water. On or about July 2, Westinghouse notified Garrett that it approved the final increase in envelope which Garrett requested.

92. As noted earlier, Garrett expressed doubt at the May 17–19 meetings that the UAP ASHX configuration would meet the performance specifications. On or about May 24, 1971, Garrett notified Westinghouse by telephone of its continuing doubts regarding the configuration of the surface heat exchangers depicted on the UAP drawings. By memorandum dated May 28, Pearson, then an engineering specialist in Garrett's aerodynamics department, informed the Garrett program of his conclusion that it was doubtful that ASHX's of the configuration depicted on the UAP

---

17. The parties argue about whether Garrett should have scaled the UAP drawings to obtain the missing dimensions. Greeven testified without contradiction that it was contrary to industry practice to scale drawings. Hence it was proper for Garrett not to scale the UAP drawings at the outset. However, on June 16, Westinghouse instructed Garrett to scale the drawings (Finding 114, *infra*); with that instruction industry practice was discarded and Garrett should have scaled.

drawings would provide sufficient cooling to meet the performance specifications.

93. On June 2, 1971, at Garrett's request, Heister,[18] Mentzell, a supervisory design engineer, and Nolan of Westinghouse met at Garrett's California facilities with Breaux, Valentino, Miller, and Pearson of Garrett. Pearson made a presentation which lasted between one and two hours setting forth the position expressed in his memorandum of May 28 to the effect that the predicted airflow generated by the UAP configuration would not equal the airflow that Garrett anticipated would be required in order to meet the performance specifications. Garrett representatives informed the Westinghouse representatives at the meeting that because of its doubts Garrett would not commit the design to production of 250 units. At the conclusion of the meeting it was mutually agreed that Garrett would investigate an alternative design. Garrett was also to investigate the availability of wind tunnel test facilities while Westinghouse was to investigate the availability of ASHX components to be used in wind tunnel or flight testing. At the meeting, Westinghouse representatives did not ask Garrett for information as to the amount by which ASHX's of the UAP configuration would miss the performance specifications nor did Garrett volunteer such information.

94. At the meeting of June 2, Garrett also recommended that the steam vents be relocated and that their design be reviewed because the steam vents as depicted on the UAP drawings interfered with the Module B ASHX inlet and because it was doubtful that the vents would provide sufficient negative pressure to meet the performance specifications.

95. Westinghouse's Purchasing Department was notified formally of the events of the June 2 meeting by TWX of June 11 from Brooks, then Garrett's Supervisor of

Contract Administration for Heat Transfer. A copy of Garrett's minutes of the meeting of June 2 was sent to Westinghouse with Brooks' cover letter on June 17.

96. After the meeting, Garrett designed alternative configurations for the ASHX and steam vents; that is, Garrett designed configurations that would meet the PDS requirements but that would exceed the available envelope. Garrett did not pursue the UAP configuration.

97. Westinghouse was obviously aware, since the parties had so agreed, that Garrett was pursuing alternative configurations, but Westinghouse was not aware that Garrett had abandoned the UAP design. Westinghouse's only belief was that Garrett would not commit the UAP design *to production.* Indeed, Brooks' June 11 TWX advised Westinghouse that "at no time during the 6/2/71 meeting or as a result of any subsequent communication between our respective engineers, has direction been given or accepted that will impact any aspect of our contractual relationship." [D. 138]. The TWX further stated that Garrett would implement no changes unless such were formally processed in accordance with the Changes Clause of the contract.

98. Because Garrett had not pursued the UAP design, reversion to it would mean delay. On or about June 30, 1971, Garrett personnel informed Vaughn, Westinghouse's West Coast representative, and Nolan that reversion would result in a three-week delivery impact.[19]

99. Westinghouse did not, however, give Garrett any decision on which design to commit to production. In a telephone conversation on July 2, 1971 Garrett informed Westinghouse that delivery of the ASHX's would be impacted on a day for day basis beginning July 1, 1971 pending direction as to which way to proceed; this was confirmed by TWX from Brooks on July 6,

18. Heister was a top level ("Fellow") engineer at Westinghouse with aerodynamic expertise. He died before his deposition could be taken.

19. Although there is no question that Garrett so informed Nolan and Vaughn, two days earlier Brooks failed to mention in a TWX to Matejka that any delay would result if Westinghouse did not authorize the Garrett proposed configuration. D. 180.

1971 inviting Westinghouse to a meeting on July 9. A response TWX from Westinghouse requested a presentation of the amount by which the UAP design would miss the specifications.

100. At the July 9 meeting, after being informed by Garrett of the amount by which the UAP configuration would miss the specifications, Westinghouse elected to proceed with the UAP configuration and to relax the specifications if necessary. Because Garrett had not pursued the UAP design and would now have to, three weeks in addition to the day for day impact had been lost, for a total delivery impact of approximately four weeks. In a July 12 telephone conversation Westinghouse informed Garrett that it would relax the specifications to accommodate the UAP configuration. This relaxation was necessary in that the UAP configuration would in fact have missed the specifications.

101. Westinghouse never instructed Garrett to abandon the UAP design and the contractual requirement that the UAP configuration be used was never suspended by Westinghouse.

102. Certain changes were requested by Garrett that related neither to specifications nor envelope; one of these was a "datum" change. Dimensions on drawings may be measured from a specific surface (the top or the end, for example) or they may be measured from more-or-less arbitrary points called "datums." Datums are often physically located on a component (as a dowel pin or a drilled hole) to assist an inspector in checking dimensions on the manufactured item. On the UAP top-assembly drawings, many dimensions were measured from datums. The locations of these datums were unacceptable to Garrett. To accommodate Garrett's design and tooling arrangements, Westinghouse agreed to relocate the datums on the source control drawings to points prescribed by Garrett. This process "involved the recalculation of literally hundreds of dimensions on the three cold plates."

103. Engineer-to-engineer contact also occurred when Garrett requested dimen-

sions and other information missing from or undeterminable from the UAP and other drawings given Garrett at the May 17–19 meetings. Significant delays ensued as Garrett sought and received this information piecemeal. See findings 54–57, supra.

104. Other communications were necessitated by certain Westinghouse-imposed changes.

105. One of the principal such changes occurred when Westinghouse first assembled a pod (using a UAP cooling system). Westinghouse found that the pump package, which mounted on the service-module cold plate, physically interfered with the antenna mounted in the most forward part of the pod. Westinghouse informed Garrett of the problem and alerted them that details would be forthcoming as they became available. Westinghouse engineers spent several days attempting to find solutions to the various problems that the interferences caused and transmitted to Garrett as they developed it in several telephone conversations and letters the dimensions of the new envelope available to Garrett in the pump-package area. Although Valentino complained in his testimony about what he described as a "series" of changes in this area, he acknowledged that the impact on Garrett's work would have been far more adverse if it had received no notice (of what is, in truth, only one change) until Westinghouse finally determined the new envelope.

106. Other such changes include: (a) relocation of certain holes on the cold plate upon which components were mounted, (b) placement of a wire bundle cut-out in the forward area of the Module B cold plate, (c) substitution of automatically for manually adjusted quick disconnects and switching of their male-female fittings, and (d) change in distance from the steam vent valve to the end of the frame. These changes all required redesign time on Garrett's part. Except for the stem vent valve, however, Garrett claims no schedule impact on account of these changes.

107. The UAP top-assembly drawings of the Module B cold plate assembly set forth a dimension for the distance from the end

of the frame to the steam vent valve of 1.671 inches. On or about June 8, Garrett was informed that that dimension was 2.38 inches and the preliminary source control drawing sets forth the same dimension, 2.38. On July 1, however, Garrett was notified orally by Demske that the dimension had been changed to 1.62 and on July 8, Westinghouse confirmed the change. As a result of the change it was necessary for Garrett to redesign the valve casting and the internal plumbing of the cooling system frames. This redesign effort took approximately a week to ten days. Revised drawings setting forth a change in the dimension to 1.62 were prepared by Garrett and forwarded to its vendor, Metal Bellows, on or about July 18 or 19, 1971. As of July 21, Garrett understood from its supplier that this change might cause a delay of four weeks in the delivery of cooling systems because the valve required a long lead time.[20]

108. Underlying all that occurred from the May meetings to July 21 was the lack of source control drawings. Although Westinghouse did not promise them within a week, Garrett expected them within a week, and they were not forthcoming.

109. As already noted, the final PDS, which expressly incorporated the source control drawings, was provided within a week of the May meetings, on May 26, as promised. Whelan then began planning the SCD's. In view of the expected magnitude of the task, he sought and obtained the assistance of another parts engineer. Their task was to collect all the details pertaining to envelope, interface and some testing and performance requirements and put them in a rough, free-hand copy which draftsmen and typists could then convert into smooth, finished drawings.[21]

110. On or about June 3 or June 4, during a telephone communication with Whelan, Valentino stated Garrett needed the source control drawings and Whelan replied that the Westinghouse people were working on the drawings and expected to get them out. Whelan did not state when he had begun or when he intended to finish.

111. On June 11, at Valentino's direction, Brooks sent a TWX to Matejka, the Westinghouse subcontract specialist, calling attention to the provisions of the PDS incorporating the source control drawings, and stated:

At the time of contract award, we were advised that copies would be available within one week. These drawings contain vital interface data that is urgently needed by AiResearch. Unless these drawings are received by Monday, June 14, 1971, the program will be impacted on a day for day basis. [P. 51].

112. On Saturday, June 12, during a squawk box telephone conversation among Whelan at Westinghouse and Nolan, Fujimoto, a Garrett engineer, Valentino and Lane at Garrett, Valentino again inquired about the status of the source control drawings and Whelan replied that they were "working like mad on them."

113. On June 14 Matejka showed Whelan the Brooks-to-Matejka TWX threatening day for day impact. Whelan that day prepared a list of the drawings given to Garrett during the contract negotiations and also detailed the Westinghouse view of the understandings that had been reached regarding the use of those drawings. [P. 52]. On June 16, Matejka, in response to Brooks' TWX of June 11, transmitted Whelan's information to Garrett, stating in part:

recognized that a particular feature represented a UAP design detail, he would ignore the detail and provide the full envelope available. In such instances, he would physically measure the distance available inside the pod to obtain the correct envelope dimension. This method of preparation is often used in preparing SCD's.

---

**20.** Such a schedule slippage would be concurrent with and not consecutive to the ASHX slippage.

**21.** In preparing the SCD's, Whelan relied heavily on the UAP top-assembly drawings. Where dimensions were missing from those drawings, as they frequently were, Whelan would "scale" or measure those distances, to obtain the relevant dimensions. In some cases, where he

Westinghouse agrees that ¶ 2.2 of specification PDS21780 lists a number of drawings which are to be furnished to Garrett. A review of the purchase order file, notes of telephone conversations between our respective engineering departments, and notes from meetings held at Westinghouse prior to the contract award indicate that the information that was passed by the aforementioned means *essentially* furnishes Garrett with *the majority of the information required to sustain the design effort*. The information previously exchanged is being transferred to Westinghouse format drawings and will be furnished to Garrett as soon as possible. It is Westinghouse's opinion that the present lack of the formal drawings referenced in the specification will not impact the Garrett effort and we therefore take exception to and cannot accept the statement that lack of these drawings will cause a day for day slip in the delivery schedule.

[P. 53] (emphasis added). Matejka did not (in this letter or at any other time) deny Brooks' assertion that at the May meetings Garrett was told that final drawings would be delivered within one week.

114. Matejka's letter of June 16 further stated, based on Whelan's input, that Garrett could scale the UAP drawings to obtain missing dimensions. This was the first time Westinghouse instructed Garrett to scale the UAP drawings.

115. Also on June 16 Vaughn prepared for Westinghouse a list of items which Garrett claimed required Westinghouse action. The first of these items stated: *"W drawings; Par. 2.2, PDS 21780*—needed by AR. See copy of 6/11 TWX Brooks to Matejka." [D. 156] At the time he prepared the memorandum, Vaughn considered this to be the most important of the "action items" on his list.

116. On June 17, Brooks sent a TWX to Westinghouse calling to the attention of Westinghouse Garrett's need for definitive source control drawings. [D. 159].

117. Whelan meanwhile was concentrating his efforts on the more complex compo-

nents, especially the three cold-plate assemblies. He completed his work on the Service Module steam vent drawing first, and a copy (marked "preliminary") was given to Garrett around mid-June. He then completed his work on the SCD's for the Module A and Module B cold-plate assemblies. The preliminary drawing for these parts was given to Breaux when he visited the Westinghouse facility on June 24–25.

118. The preliminary drawings contained errors, including the failure to incorporate certain changes that had been made and conveyed to Garrett since the May meetings. These errors required inquiry by Garrett to verify which was the correct information.

119. By TWX dated June 23, Matejka requested a date on which Garrett would be ready for the design review meeting called for in the PDS 21780. [D. 165]. In reply by TWX dated June 23, Brooks stated that Garrett would be ready for a preliminary design review meeting in approximately two weeks, adding:

This review must of necessity be preliminary in nature since the physical configuration of certain components is based on UAP outlines as modified by discussions between our respective engineers. We would anticipate holding a final design review after receipt of all Westinghouse drawings. [D. 166]

120. A June 30 memorandum of Vaughn's stated that the five source control drawings had not been received by Garrett, and maintained them as action item number one, adding, "Engineering has provided preliminary Module A & B drawings. AR requests official dwgs through Purchasing— Matejka." [D. 180].

121. By July 1 Whelan had finished his work on the Service Module cold-plate assembly. He then went on vacation for one month. A preliminary SCD for the Service Module cold-plate was delivered to Garrett by July 6. Little work on the final source control drawings was done from then until July 21. Moreover, the two source control drawings which Garrett had not yet been

furnished even in preliminary form[22] had not even been begun when Whelan left.

122. On July 2, during a telephone communication between Derbes and others of Garrett and Miller and others of Westinghouse, Garrett representatives again emphasized Garrett's need for source control drawings.

123. On July 7, Garrett sent Westinghouse its formal review of the May 26 PDS 21780 which review at numerous places points out the need for final source control drawings.

124. During a meeting of Garrett and Westinghouse representatives held on July 9, 1971, Westinghouse indicated that "final dimensional information" would be delivered during the period July 13 through July 16. The minutes of the meeting use the words quoted and do not say source control drawings would be provided. [D. 201].

125. By memorandum dated July 14, Vaughn notified Westinghouse personnel in Baltimore of several items which Garrett claimed required Westinghouse action. The first item reiterates the first item of Vaughn's June 30 memorandum.[23] [D. 207].

126. In a letter of July 17, 1971, Brooks informed Westinghouse that Garrett could not submit a schedule of delivery dates on a component basis in the absence of the Westinghouse drawings.

127. By TWX dated July 20 [D. 215] Brooks demanded the final source control drawings stating that it was the original understanding "that drawings would be available in one week." In his reply of July 27 [P. 65], Matejka did not deny this assertion.

128. By letter of July 22, 1971 to Fred Trost of Westinghouse, Vaughn forwarded copies of his prior reports to Westinghouse, stating,

As you can see the lack of W dwgs has been Item 1 since 6/16. Your Deputy Manager's copy has been addressed to Dave Roese per instructions of Gene Fox during his visit here on 6/13. I wonder if Dave has received the copies addressed to him. All copies are sent to Matejka for distribution within Westinghouse. [D. 224].[24]

129. In a TWX of July 22 Brooks stated Garrett had been promised final drawings within one week. [P. 61]. Matejka did not deny this in his reply of July 27. [P. 65].

130. Despite its largely unheeded demands for SCD's Garrett was able to make progress with the information it had.

131. Garrett expected to release its design drawings to manufacturing by June 23 or so (an earlier June 19 plan having been made without knowing how many drawings would be required). Roughly half of the 220 or so necessary drawings had been prepared by June 30, and about 80 more were prepared within the following week; these and most of the other drawings were released during the week of July 1 through

---

22. These two were the reservoir SCD and the ASHX SCD. *See* Finding 51, *supra*.

23. Set forth in Finding 120 *supra*. It should be noted that Vaughn visited Garrett as a "sideline" to his regular West Coast duties. He made no substantive evaluation of Garrett's demands, he simply reported them to Westinghouse.

24. Nolan had similar concerns. In a note dated July 21, he wrote:

Roy [Baysinger] asked me if there was anything that W still owed Garrett. I said they still wanted the drawings called out in the spec. I asked him about the drawing schedule which he called in to me on July 7

. . . . Later (about 6:30 EDT) I called Jim Fawcett's home—his wife said he was working on a fire drill. I called him at work. He, Walt and Ed Petraska were working on drawings—trying to get them out by Thursday afternoon [July 22]. It appeared that Roy Baysinger had not known that the drawings were still outstanding and that he cracked the whip when he found out. It occurred to me later that every set of Bill Vaughn's notes had reminded of the drawings. Apparently, the notes weren't getting to the right people. [D. 213].

Then on July 22 he wrote that during a telephone communication with Russ Spencer on that day he mentioned that "Bill Vaughn's papers should be more widely read." [D 213a].

July 8. A number of these drawings were not complete, but there is no evidence of what was missing or whether it was meaningful.

132. Garrett's manufacturing people had also made some progress, even before release of the design drawings (mainly beginning July 1 but also before that), toward completing their planning work. This involved scheduling and the preparation of written instructions (called "MOT's") that tell machinists and other manufacturing personnel exactly what steps to follow to produce a particular part from a drawing. Normally this work is not done until design drawings are released.

133. Garrett had also by this time placed orders for all parts which were to be procured from outside vendors.

134. The net effect of Garrett's progress was that compliance with the contract delivery schedule still seemed feasible as of the first part of July. This fact was expressly communicated to Westinghouse at that time by Garrett's management in response to a Westinghouse request as to whether the contract delivery schedule could be accelerated. After consideration by the appropriate departments, Garrett's Assistant Division Manager Derbes replied to C. Miller of Westinghouse by telephone on July 2(a) that the contract schedule was tight but still feasible and (b) that if Westinghouse paid Garrett an extra $50,000, Garrett would attempt, but could not promise, to beat the contract schedule by up to a week. Westinghouse declined this offer.[25]

135. That Garrett thought it might still be able to meet the delivery schedule does not mean that the lack of SCD's had been without impact. Reference has already been made to the substantially heightened design and redesign time occasioned because of Westinghouse-imposed changes and because of missing dimensions and problems in obtaining them. Findings 57 & 103–107, *supra.* Moreover, although the delivery schedule may have been feasible on July 2 the situation deteriorated thereafter. For example, the steam vent valve situation (Finding 107, *supra* ) was not finally resolved until July 18 or 19 when a four-week slip was forecast, the bulk of which is attributable to Westinghouse.

136. Nolan expressed his view of the situation in a note dated July 21:

> During the design phase of the Garrett effort, certain problems have arisen which could impact schedule and/or price. It is likely that some of these problems will be subjects of the final negotiations. Garrett will contend that many of the problems would not have developed if complete, accurate envelope and interface information had been provided early in the program. In many cases, this is true. Westinghouse will indicate that sufficient information was provided by the UAP drawings and subsequent data to enable Garrett to design their system. For the most part, this is true. However, there are an unfortunate number of items for which Westinghouse at least has a share of the blame. [D. 218].

## V.

### Termination of the Contract

137. After July 2, problems associated with the program caused Derbes increasingly to feel that a meeting of Westinghouse and Garrett management was desirable. These problems included lack of source control drawings, growing impossibility of meeting the contract schedule, and estimated production costs substantially in excess of the original cost estimates on which Garrett's bid had been based.[26] Between July 2

---

**25.** Garrett did advise Westinghouse, as has already been discussed, that the ASHX's would be delayed day-for-day from July 1 until Westinghouse decided whether to allow an envelope violation or to waive a performance specification.

**26.** In fact, Garrett's cost review showed that its costs of manufacturing (*i. e.,* not including de-

and July 21, a detailed examination was made at Garrett in order to estimate the probable delivery date of the first of each of the cooling system components. Garrett's program management also initiated an effort to develop a less costly alternative design of the cooling system in view of the projected cost overrun. However, as of July 21, Garrett had not made an analysis to determine what portion of the cost overrun was attributable to Westinghouse and what portion was attributable to Garrett.

138. By letter of July 17, Garrett requested a meeting with Westinghouse management on July 21. [P. 59]. The purpose of the meeting was to involve Westinghouse management in the resolution of the following problems: (1) the failure of Westinghouse to deliver final source control drawings to Garrett, (2) Garrett's estimate that the cost of production of cooling systems would substantially exceed its original estimates, and (3) Garrett's estimate that the date of delivery of the first cooling system would be substantially later than the August 24 date set forth in the original authorization to proceed.

139. Garrett's letter requested that Fox, Trost, and Legin, Fox's superior and Westinghouse's Manager of Electronic Warfare Systems, attend the meeting. Unfortunately, Garrett's letter did not reach Westinghouse until July 21 and Westinghouse's first indication that Garrett desired a meeting came when Fox received a telephone call from Morgan on July 20. Because of the short notice, neither Legin nor Fox was able to break previously made commitments to meet with the Garrett representatives until the afternoon of July 21. It was, however, arranged for them to meet with Matejka and his supervisor, C. Miller, in the morning.

140. On the morning of July 21, Derbes, Brooks and Breaux met with Miller and Matejka. Miller stated that the Westinghouse Purchasing Department had the responsibility of interfacing with vendors and subcontractors. The Garrett representatives got the impression they would not be permitted to see Westinghouse management until they had stated their position to Miller and Matejka; if Miller and Matejka felt that the conversation was of sufficient merit, a meeting with management might occur later. Miller, the senior of the two, left the meeting shortly after introductions were completed, explaining that he had another commitment.

141. The morning meeting lasted approximately two to two and one-half hours, during which Breaux and Derbes each made informal presentations of approximately one hour.

142. Breaux's presentation related to technical aspects of the program, consisting primarily of a description of various cold-plate designs. Discussion centered around the several charts attached to Defendant's Exhibit 219. Two of the charts (those labelled "Configuration Comparisons" and "Deviations for PDS 21780") deal with the cold-plate design question. They show (1) the "basic design" which Garrett had proposed under the R–Spec in January 1971, employing a one-piece cold plate,[27] (2) the existing configuration, to which Garrett was designing ("configuration PDS 21780"), described as a "major configuration change" from the R–Spec, and (3) a new design, otherwise consistent with the requirements of PDS 21780 but employing a one-piece rather than a three-piece cold plate.

143. Garrett proposed that Westinghouse authorize the new one-piece PDS 21780 design in order to save costs. In particular, Garrett presented a series of price proposals filled in by hand at the

sign work or tooling) would be approximately double the per-unit price it had bid. In other words, every time Garrett shipped a cooling system it would lose about $5500' for a total loss of over $1,375,000 on the contract as a whole.

27. The purpose of including the R–Spec configuration in the discussion is not clear. Garrett's witnesses' opinions differed on the subject. *See* PPF 139.

meeting on a chart labelled "Hardware Sell Price." For 250 cooling systems, the prices were $6,800 for the R–Spec configuration; [28] $13,200 for the existing PDS 21780 design; [29] and $9,670 for the proposed PDS 21780 one-piece design. *See also* Finding 153, *infra*.

144. Garrett's design of a one-piece cold plate would have been interchangeable with the design of the cold plates which UAP was producing under the 20-lot subcontract. However, it would require spare parts different from the three-piece assembly provided for in the PDS, and in the event of corrosion the entire cold-plate assembly would have to be replaced.

145. Garrett also discussed the subject of schedule using a chart entitled "Schedule —Start Date 7/23/71." [30] The chart projects delivery of the first Service Module, Module A and Module B cold plates of the three-piece configuration called for in the PDS on October 8, 1971. The chart also projects that Garrett would deliver the first Service Module, Module A and Module B cold plates of the proposed one-piece configuration on the same date, October 8, 1971. [31] Derbes indicated that the schedules were Garrett's best current estimates of achievable schedules.

146. During the course of the morning meeting, Derbes also emphasized Garrett's need for final source control drawings. There was some additional discussion regarding the fact that Westinghouse changes had delayed Garrett's performance and had increased Garrett's costs. However, no effort was made by Garrett at the morning meeting to negotiate the amount of added costs or the extent of the delay which Garrett attributed to Westinghouse.

147. At the conclusion of the morning meeting, Matejka told the Garrett representatives that he would communicate the information which he had received to Westinghouse management. Immediately after the conclusion of the meeting, Fox as well as certain other Westinghouse representatives were briefed on the events of the morning meeting.

148. The Garrett representatives were quite dissatisfied with the morning meeting. Derbes was frustrated and disappointed at having been forced to meet with a lower-level purchasing representative and these feelings deepened when he was kept waiting after lunch before the afternoon meeting began around 3:00. Upon entering the conference room to meet with the Westinghouse representatives, who were already gathered, the Garrett representatives found the atmosphere "cold." On top of this, Legin promptly complained to Derbes about Garrett having approached the Air Force behind Westinghouse's back, seeking information about the prime contract. Derbes was apologetic about this breach of ethics, which only served to deepen his discomfort.

149. Derbes attempted to make the same presentation which he had made to Matejka in the morning; however, Legin refused to permit the presentation and directed that Garrett "go home and read" its contract, apparently meaning he expected Garrett to continue working to the original contract price and schedule. Derbes replied

---

**28.** The $6,800 price had never been quoted by Garrett, and it is not clear why it was referred to at the meeting.

**29.** Breaux and Derbes testified, and their minutes of the meeting reflect, that Matejka was not surprised at the magnitude of Garrett's price proposal.

**30.** July 23 was a hypothetical date chosen by Derbes as the date by which Garrett would have received final source control drawings, reviewed the drawings, and found that they were in agreement with the design which Garrett had developed through that date; all engineering changes were considered resolved as well.

**31.** How Garrett expected to produce the proposed one-piece configuration by the same date as the three-piece is not explained. By the same token there is no evidence that they could not produce either configuration in the same amount of time.

that Garrett had the right to stop the fabrication and procurement efforts and would seriously consider doing so until it received final source control drawings.

150. Legin was not aware that Garrett had not received final source control drawings, and he indicated surprise upon learning that fact. He stated that Garrett would receive the drawings promptly and left the meeting very shortly thereafter.

151. During the twenty minutes or so that remained of the meeting, Derbes and Breaux further discussed their morning presentations with Fox. Fox's primary concern was delivery schedule. If cooling system components were delayed even by the six weeks suggested on the Garrett handouts, the Westinghouse commitment to the Air Force would be delayed. Fox endeavored to ascertain whether the proposed schedule was realistic, or whether it too might be subject to additional slippages ("scoping the problem" as Fox put it). He concluded that, indeed, the schedule might well slip even farther, most likely into December (and perhaps out into February). In other words, Garrett's first delivery could be late by more time than had been provided in the first place. Fox told Garrett he thought the situation was moving backwards.

152. How Fox arrived at his schedule conclusions is something of a mystery. While he understood at the meeting that the October 8 delivery schedule presented by Garrett was premised upon an all-out, three-shift, effort, he did not interrogate the Garrett representatives in any detail in order to establish the basis for Garrett's estimate of an October 8 delivery date.

153. As for the Garrett price and design proposals, Derbes informed the Westinghouse representatives at the afternoon meeting that he was not making a demand at that time regarding price and that he was not prepared to negotiate changes, but that his purpose in revealing the price estimates was to enable Westinghouse to consider a less expensive cooling system design in order to improve its competitive position in bidding for follow-on procurements with the Air Force.[32] By the same token, Fox correctly understood that Garrett hoped the change would be authorized for the existing contract, ostensibly on the theory that it would be cheaper for Westinghouse to change now than later. While such a switch *might* be to Westinghouse's benefit in the long run, it would almost definitely be to Garrett's benefit in the short run; Garrett could expect to negotiate a new contract price and avoid the losses it was certain to accumulate under the existing price term.

154. In any case, Fox understandably was not pleased by what he learned. He could not agree to a design or schedule change without more information, and he told Garrett to make its proposal in a more detailed and formal fashion. He further told Garrett—and confirmed in writing [P. 62]—that they should document any claims of increased manufacturing costs which they believed attributable to changes directed by Westinghouse.[33]

155. Fox did understand that Westinghouse had caused Garrett some delay and he expected to negotiate some cost and delivery impact with Garrett after Garrett submitted a formal proposal. Fox also understood, as Derbes indicated at both the morning and afternoon meetings, that Garrett intended to perform its undertaking to produce cooling systems.

156. Immediately following the July 21 afternoon meeting, Derbes called Teske, Vice President and General Manager of Garrett's AiResearch Los Angeles Division, from the airport in Baltimore and apprised him of the course of the meeting. During

---

**32.** Garrett had been made aware at or before the May meetings that Westinghouse expected a substantial follow-on business from the Air Force.

**33.** Fox's desire for documentation is not without contractual basis. This would be the normal procedure under the Changes Clause, discussed *infra*.

the conversation, Derbes recommended Garrett hold production and procurement pending the receipt and review of the source control drawings. Derbes also related to Teske that Legin had committed to deliver the final source control drawings to Garrett promptly.

157. Teske concurred in Derbes' recommendation and on the evening of July 21 (or perhaps early on July 22) he placed an internal hold on production and procurement. Teske issued the hold because he understood that Legin had indicated at the July 21 meeting that final source control drawings would be delivered to Garrett within a few days; given this information Teske considered it to be prudent business judgment to suspend fabrication and procurement until the final source control drawings had been received and reviewed, rather than proceed to fabrication and risk being at variance with the final requirements.

158. It was Garrett's intention to remove the hold on fabrication and procurement after receipt and review of final source control drawings. No hold was placed on the engineering effort and it proceeded.

159. On July 22, Derbes met with Teske to further brief him with respect to the July 21 meetings. Later that day, Teske received a telephone call from Legin. Legin was apologetic that Garrett had not previously received final source control drawings and assured Teske that the final source control drawings would be delivered to Garrett as soon as possible. Teske told Legin that Garrett had put a hold on fabrication and procurement and gave his reasons for doing so. Teske further informed Legin that Garrett would proceed with performance of the agreement as soon as the source control drawings had been received and reviewed.

160. Also on July 22 Garrett sent a TWX to Westinghouse setting forth some of the events of the July 21 meeting, again demanding final source control drawings, setting forth certain information as to Garrett's position with respect to its need for the drawings, and informing Westinghouse that until adequate physical definition of the cooling system was received and Garrett had the opportunity to examine such information, Garrett had placed a stop on all production and procurement activity relating to the subcontract. The TWX added that it appeared inadvisable to speculate on price and delivery dates until the final drawings had been received at which time Garrett could also explore alternative designs to reduce costs. [P. 61].

161. The same day Fox sent a TWX to the attention of Teske asserting that Garrett had agreed to furnish promptly in writing to Westinghouse: (1) a description of Westinghouse changes and their impact on schedule and cost, (2) a formal change request for the one-piece cold plate approach and attendant effects on schedule and cost, (3) a list of drawings needed, and (4) an official written statement of Garrett's contractual position. The TWX further stated that Garrett had been advised by Westinghouse to continue working toward the original schedule and prices. [P. 62]. Garrett received this TWX after the Legin-Teske telephone conversation and the sending of its own TWX advising Westinghouse of the internal hold.

162. Fox testified that it was his intention in sending this TWX to request a formal proposal from Garrett regarding impact and changes on the basis of which Westinghouse could negotiate a change to the contract, and that as of July 22 he expected to negotiate a change in cost and schedule.

163. In addition to the other happenings on July 22, Miller and Matejka presented to Fox and Denton a recommendation of the Purchasing Department that the Garrett subcontract be terminated. Fox and Denton agreed with the recommendation.

164. Nevertheless, Fox was hopeful that Garrett might remain a QRC–522 subcontractor. Quite apart from the fact that no alternate source of cooling systems was in hand, the Westinghouse and Garrett engineering groups had a good "work-with" relationship, and Westinghouse engineers

were not eager to terminate Garrett. Westinghouse therefore continued to communicate regularly with Garrett, in an effort to bring Garrett back into line with what Westinghouse believed were its contractual obligations.

165. Teske replied to Fox's TWX with a TWX of his own on July 23. [P. 64]. The Teske TWX merely stated that Garrett's official contractual position was stated in Brooks' July 22 TWX (formally advising Westinghouse of Garrett's hold) [P. 61], and requested final copies of all drawings listed in the PDS. Neither the first nor the second point raised by Fox's TWX (Finding 161, *supra*) was ever answered by Garrett. That is, Garrett never documented the Westinghouse changes that had impacted its schedule and cost, and never formally proposed the switch to a one-piece design and the schedule and cost impact of so doing; the July 21 presentation remained Garrett's proposal on the latter and the former information was never provided.

166. Immediately following the July 21 meeting, Fox ordered a crash program to complete all remaining drafting and typing work on the source control drawings. It is not clear how much engineering work had been done prior to Whelan's vacation and how much had been accomplished in his absence, but final drawings were ready in two days. Sullivan, of Garrett's Washington office, received released SCD's on Friday, July 23, and additional sets were mailed that same day to Garrett in Los Angeles; the drawings were not available for review by Garrett's engineers in California until Monday, July 26.

167. In the rush to complete the drawings, mistakes were made. Certain changes that had been made during the course of the contract had not been incorporated; some dimensions were simply mistakenly copied from earlier drawings, including the UAP drawings and the preliminary SCD's. Garrett correctly assumed that these were mistakes and not revisions to the earlier information.

168. On July 27 Westinghouse wired that with the transmission of the SCD's it should now be possible for Garrett to estimate a delivery schedule and cost impact for the alleged Westinghouse changes. [P. 65]. Westinghouse requested that Garrett provide to Westinghouse within 24 hours the date by which Westinghouse would receive a firm production schedule and assessment of cost impact. In order to lessen possible costs, Westinghouse also placed a hold on Garrett's "data, tooling and test effort." [34]

169. In May of 1971, at the time of the authorization to proceed, Garrett did not have in-house the tooling that would be required to build the cooling systems. Westinghouse knew or had reason to know that Garrett intended to fabricate the tooling to be used in its in-house work on the cooling system units. At the time of the Westinghouse hold on tooling, approximately 60% to 70% of the tooling remained to be produced. The effect of the Westinghouse tooling hold, therefore, was to prevent Garrett from fabricating cooling system parts even if it removed its own internal hold because without tooling, fabrication of cooling system components could not proceed. [35]

170. Meanwhile, the reprocurement effort was proceeding. On Tuesday, July 27, Fox met with Mooney and Cozzolino of UAP. UAP offered to sell a data package which included engineering production drawings and applicable design drawings to Westinghouse for $225,000; in connection with that transaction, UAP also offered to fabricate 150 or 300 cooling systems at a

---

**34.** "Data" and "tooling" were items in the authorization to proceed to be covered by purchase order forms separate from that issued for the cooling system itself. "Data" is information transmitted on a specific Department of Defense form. The tooling purchase order was to cover the purchase of "hard tooling" or tooling designed specifically for this subcontract. No hold was placed (or, indeed, could be placed) on "soft" (or "universal") tooling.

**35.** It would be extremely impractical and time consuming to manufacture 250 cooling systems with soft tooling; hard tooling was a virtual necessity for fabrication of any appreciable quantity.

price not to exceed $11,500 per unit with the first deliveries by the end of October. [P. 66; D. 378].

171. On July 28, Brooks responded to the Westinghouse TWX of July 27 stating that Garrett currently estimated that 100 to 450 additional hours of engineering effort would be required to review the final source control drawings because of the amount of data which they contained. He stated that Garrett anticipated being in a position to apprise Westinghouse of schedule and price impact by Tuesday, August 10, 1971, and that this quotation would be accompanied by a description of each change and a corresponding price. [D. 232].[36]

172. On Thursday, July 29, Westinghouse notified Garrett by TWX that Garrett had "failed to comply with the performance schedule and technical specification of purchase order 86FS–DH–43000–OW. As a result of your failure to perform, you are delinquent and no excusable delay is in evidence." The TWX further provided that Garrett was thereby afforded an opportunity to present in writing within ten days "any facts or circumstances which you believe excuse your failure to perform, and to specifically present your detailed plan for meeting the technical specifications and delivery schedule." [P. 67]. A notice such as this is known in the contract administration and purchasing departments pertaining to government contracts as a "show cause notice." (At the time Garrett received the show cause notice, Garrett had received no prior communications from Westinghouse indicating that Garrett had failed to comply with any technical specifications).

173. Although the sending of a show cause notice indicates that a contract is in jeopardy, it does not indicate that termination is inevitable. It invites an explanation of the "problems" and a proposal for curing them, which, if satisfactory to the buyer, will prevent termination.[37]

174. On July 30 Westinghouse formally notified UAP of its acceptance of UAP's offer to sell drawings to Westinghouse [38] and to fabricate 150 cooling systems for not in excess of $11,500 per unit with the first deliveries by the end of October. [P. 68]. On August 2 UAP engineers were alerted by Westinghouse to certain differences between PDS 21780 and the R–Spec. Thereafter, certain changes to the PDS including some specification relaxations were made to accommodate the UAP in-house production efforts and to avoid further delays. These changes were not very significant.

175. On August 5, Garrett notified Westinghouse of its disagreement with the position set forth in the Westinghouse show cause notice of July 29. [P. 69]. Garrett cited Westinghouse's delay in providing final source control drawings and the existence of specification conflicts as reasons for its impending failure to meet the delivery schedule; Garrett claimed it was without fault.

176. Garrett continued to work on the engineering aspects of the cooling systems until August 9 when Westinghouse, still lacking a detailed response from Garrett, ordered a full stop on all work. [P. 70].

177. By TWX dated August 11, Garrett delivered a quotation of anticipated cost and delivery dates for components of the cooling system. [P. 71]. This TWX was in response to Westinghouse's request for a

---

**36.** D. 232 was the subject of examination at trial but was not offered in evidence. The court hereby admits it as Court Exhibit 1.

**37.** Moreover, the buyer bears the risk of wrongful termination. *See* DISCUSSION *infra.*

**38.** The UAP manufacturing drawings Westinghouse bought were not simply the ten top-assembly drawings which Westinghouse had turned over in excised form to Garrett. The manufacturing drawings (several hundred in number) are actually used in the shop to fabri-

cate individual cooling-system parts which are ultimately assembled into full components. By having these drawings, Westinghouse could launch its own in-house effort. Although it lacked sufficient technological expertise to accomplish the brazing operations, the contract schedule was in peril, and Westinghouse had no choice but to fabricate at least some systems in-house. Fox vested responsibility for the in-house effort in a cooling system Program Manager.

formal proposal on the basis of which Westinghouse could negotiate the impact of changes. The components requiring the longest lead time under the Garrett proposal are the central components of the entire pod, the Module A and B cold plates, projected for delivery sixteen weeks (112 days) after Westinghouse issued an authorization to proceed. (The original contract itself was intended to span only ninety-seven days from the receipt of order until first delivery.) Garrett also proposed a new price for cooling systems under the present subcontract of almost double the original price. With slight modifications, Garrett confirmed the August 11 quotations by letter of August 14. [P. 73].

178. Westinghouse did not wait for the August 14 confirmation, however. With the August 11 proposal in hand, Westinghouse terminated Garrett for default on August 13 [P. 72] and proceeded with in-house manufacturing and reprocurement from UAP.

### DISCUSSION

### I.

#### Applicable Law

■ The contract in this case specifically provides that Maryland law shall control. Moreover, the parties are in accord that the instant contract is one for the sale of goods and hence is governed not only by the general contract law of Maryland, but, where appropriate, by Article Two of the Maryland Uniform Commercial Code. The parties further agree that while the federal law controlling United States Government contracts [39] may not be binding on the instant dispute it at least provides persuasive guidance,[40] for two reasons. First, the instant contract specifically incorporates certain of the Armed Services Procurement Regulation contract clauses used in many Government contracts. These clauses have long been used in Government contracts and have a considerable administrative and judicial gloss. Where the parties to a contract adopt a standard and oft-construed clause, it is only logical that their intent is also to adopt the gloss thereon. The meaning of standard language is inseparable from its prior interpretation. The second reason for looking to the law of Government contracts in this case is that the contract in dispute is actually a subcontract under a United States Air Force prime contract. To the extent a decision herein may impact on the performance of contracts to which the United States is a party, this court must evaluate policy considerations which have influenced the development of Government contracts law. Accordingly, the court will refer to Government contracts law on questions of policy and the construction of standard clauses, and will refer to Maryland law on questions of sales and the general rules of contract interpretation.

### II.

#### The Contract

■ Garrett argues that there was no legally enforceable contract in this case because there was no meeting of the minds

**39.** Hereinafter the terms "Government contracts" and "Government contracts law" will be used to refer to contracts to which the United States is a party, and to the law construing and controlling such contracts. "Government" refers to the United States Government.

**40.** Westinghouse suggests that Government contracts law is in fact binding on the decision in this case under the *Clearfield Trust* doctrine. *Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943). The forcefulness of this argument is diminished somewhat by the Supreme Court's recent decision in *Miree v. DeKalb County*, —— U.S. ——,

97 S.Ct. 2490, 53 L.Ed.2d 557 (1977), decided after the submission of the briefs in this case. Moreover, "[i]t is customary, where Congress has not adopted a different standard, to apply to the construction of government contracts the principles of general contract law." *Priebe & Sons v. United States*, 332 U.S. 407, 411, 68 S.Ct. 123, 125, 92 L.Ed. 32 (1947).

Whether Government contracts law is binding or precatory does not affect the outcome of this case, however. The court's decision in this matter reflects an appropriate regard for the decisions and policies of Government contracts law.

and no agreement as to essential terms and conditions. This argument is wholly without merit. The facts are clear that both parties knew and understood the terms and conditions of the contract and the court so finds. With one irrelevant exception there is no question that both parties were fully aware of the documents that comprised the contract and that those documents are clear on their face and provide all the essential elements of a contract of sale.[41] *See also Annotated Code of Maryland*, Comm.Law article, § 2–204(3).[42] Moreover, Garrett's performance belies any assertion that there was no contract. Garrett can hardly be heard to argue that it worked daily and intensely for two and one-half months on a contract that did not exist. *See id.*, § 2–207(3).[43]

### III.

### *Material Misrepresentations*

Garrett next argues that Westinghouse wrongfully misrepresented material facts during the May 17–19 negotiations and that these misrepresentations induced Garrett to enter the contract upon the terms agreed. Accordingly, Garrett argues, the contract is voidable.

 The court disagrees both as a matter of fact and as a matter of law. As a factual matter, the court's findings, *supra*, contain no finding that Westinghouse misrepresented any material matter. As for omissions, the facts indicate that Westinghouse did not omit to state any fact which it had a legal duty to disclose. Both parties to this case are large, sophisticated engineering contractors. Westinghouse had no duty to disclose anything to Garrett unless there was something so peculiarly within Westinghouse's knowledge and so material to Garrett's bid that it was "vital to the performance of the contract" and virtually unobtainable by Garrett. *Hardeman-Monier-Hutcherson v. United States*, 458 F.2d 1364, 1371–72, 198 Ct.Cl. 472 (1972). Beyond this exceptional circumstance Westinghouse's only duty was to refrain from active misrepresentation. Silence is not ac-

---

**41.** The formal contract in this case is the Westinghouse Purchase Order of July 16, 1971 [P. 47], together with the documents referenced therein. Although the purchase order did not issue until mid-July, it added no new terms but merely replaced the initial contractual document issued contemporaneously with the May negotiations and the commencement of performance. That document was the Westinghouse Authorization to Proceed [P. 45], as corrected [P. 46] and supplemented [P. 48]. The authorization to proceed [P. 46] and its addendum [P. 48] reference all the documents ultimately referenced in the purchase order. Chief among these is the PDS 21780 and the parties' Overriding Agreement.

One subject of dispute is which of Westinghouse forms CMF–118A [D. 102] and CMF–118B [P. 35] is part of the contract. The Overriding Agreement of the parties in effect at the time the instant contract formed incorporated CMF–118A. The addendum to the authorization to proceed expressly incorporated the Overriding Agreement with CMF–118A changed to CMF–118B; the final purchase order maintains this term. When Garrett received the addendum to the authorization to proceed, however, it expressly reserved on acceptance of the substitution and represented that CMF–118B would "be commented upon under separate cover." Such comment was never forthcoming.

There are no differences between the two forms in any respect material to this case. Hence the court need not decide which was part of the instant contract. Suffice it to say that all terms which are identical in each are part of the contract and the parties so intended. *See also* Tr. 3683.

**42.** Hereinafter cited as *Code*.

**43.** Garrett also argues that Westinghouse failed to obtain Government approval for the instant contract pursuant to the terms of the purchase order. This requirement is not of the sort which would enable *Garrett* to say that its nonfulfillment renders the contract nugatory. The risk is borne by *Westinghouse*. If Westinghouse subcontracts with an unapproved source and that source supplies Westinghouse with the goods contracted for, Westinghouse must pay the source. Rejection of the goods by the Government because not from an approved source is the prime contractor's risk. Moreover, there is evidence in this case which warrants the conclusion that satisfactory approval was obtained. Tr. 469–72 and 507–08; PPF 13.

tionable where the parties are equally sophisticated and where a contractor can reasonably be expected to obtain and evaluate the facts for himself. *Helene Curtis Indus., Inc. v. United States*, 312 F.2d 774, 778, 160 Ct.Cl. 437 (1963). There is no duty in an equal bargaining situation to prevent the other party from making an improvident contract. The facts show that Garrett kept generally abreast of UAP's progress and that Westinghouse concealed no detail which it had a duty to disclose.

■ Finally, as with Garrett's challenge to the existence of a contract, its claim for rescission comes too far down the road of performance to be given much weight. "[Garrett's] proper action would have been to bring an action for rescission. . . . By the act of performance [Garrett] lost [its] right to rescission . . . as well as [its] right to deny the existence of the contract." *Adler Construction Co. v. United States*, 423 F.2d 1362, 1366, 191 Ct.Cl. 607 (1970), *cert. denied*, 400 U.S. 993, 91 S.Ct. 461, 27 L.Ed.2d 441 (1971).

## IV.

### *Failure to Provide Source Control Drawings*

Although defendant (in standard law school fashion) makes nearly every conceivable alternative argument in support of its position, one above all lies at the heart of this case, as plaintiff recognizes. This central issue concerns the legal ramifications of Westinghouse's failure to provide source control drawings until July 26, 1971.[44]

It is undisputed that paragraph 2.2 of PDS 21780 required Westinghouse to supply source control drawings. It is also undisputed that final SCD's were not provided until July 26, 1971. Westinghouse argues that it at all times supplied Garrett with sufficient information from other sources to sustain the design effort. Garrett argues not only that Westinghouse did not provide adequate alternative information but also that the contract entitled Garrett to SCD's in particular.

Westinghouse bases its position that supplying alternatives rather than SCD's was contractually sufficient on the following clause in the contract:

5. CHANGES—Buyer may at any time, by written order, without notice to any surety, make changes or additions within the general scope of this purchase order in or to drawings, designs, specifications, instructions for work, method of shipment or packing, or place of delivery. If any such change causes an increase or decrease in the cost of, or the time required for, performance of this purchase order, Seller shall notify buyer in writing immediately and an appropriate equitable adjustment will be made in the price or time of performance, or both, by written modification of this purchase order. Any claim by Seller for such adjustment must be asserted within 30 days, or such other period as may be agreed on in writing by the parties, after Seller's receipt of notice of the change. Nothing contained in this paragraph shall excuse Seller from proceeding with the contract as changed. [P. 35].

Westinghouse maintains that its provision of alternative sources of information was a change within the meaning of this clause.[45] By the last sentence therein Garrett thus

---

44. Westinghouse actually provided the source control drawings to a Garrett representative on the East Coast on Friday, July 23, 1971. It was Monday, July 26, 1971, before Garrett had the drawings at its West Coast offices where they were to be used. The delay from the 23rd to the 26th is accounted for by the intervening weekend and appears to be without any fault on Garrett's part. Hence the court considers July 26, 1971 as the effective date of delivery.

45. Although the Changes Clause sets forth a formal procedure for effecting changes, including initiation by formal order (or "change notice"), the Court of Claims has long sanctioned "constructive changes" whereby what would be a change within the meaning of the clause but for a failure of the formal requisites is given such effect nonetheless. *E. g., Len Company & Assoc. v. United States*, 385 F.2d 438,

had a duty to proceed despite the change. Westinghouse argues that when Garrett placed its stop on production and procurement on July 22, 1971 it breached its obligation to proceed. Moreover, in Westinghouse's view, this stop, coupled with Garrett's presentation at the meeting of July 21, the fact that no design review had yet been held, and several other factors, justified Westinghouse's belief that Garrett had so failed to make progress as to endanger performance. When Westinghouse notified Garrett of its apprehensions and requested they be cured, Garrett's response was inadequate, Westinghouse argues, and it rightfully terminated Garrett for default under the Default Clause (Paragraph 12 of the Terms and Conditions section) of the parties' contract. Alternatively, Westinghouse argues its termination of Garrett was justified under the Uniform Commercial Code either as a permissible response to an anticipatory repudiation or as a permissible reaction to a failure to give adequate assurances where such are justifiably requested.

■ The Changes Clause in this contract derives from the Armed Services Procurement Regulations. The case law interpreting such clauses makes clear that not every change or series of changes is "within the general scope" of the contract. Depending on the facts of the individual case, a change or changes may be so fundamental as to be beyond the scope of the contract; these are termed "cardinal changes" and create a right to a breach of contract remedy in the party upon whom such changes are imposed. *E. g., Edward R. Marden Corp. v. United States,* 442 F.2d 364, 369–70 (Ct.Cl. 1971). Changes may also be within the general scope of the contract, but outside the language of the particular changes clause at issue. For example, in the present case, to be within the Changes Clause a change must be "in or to drawings, designs,

specifications, instructions for work, method of shipment or packing, or place of delivery." Lastly, it is obvious that not every variation from the terms of a contract with a Changes Clause is a change at all; many variances are outright breaches.

Which of the foregoing alternatives best applies to a given situation is not always perfectly clear and there may be some overlap. But the result in each case is the same: a variance which cannot properly be considered a change is a breach of contract; a change not within the language of the Changes Clause is equally a breach of contract; and a cardinal change is a breach of contract.

■ It is this court's opinion that under the facts and the applicable law Westinghouse's failure to furnish SCD's until July 26, 1971 was a breach of contract. Moreover, this result obtains under any of the above approaches. The court is primarily of the opinion that Westinghouse's failure to furnish the SCD's was not a change at all, but was an outright departure from the terms of its contractual undertaking and hence a breach in the first instance. But many of the reasons supporting this conclusion equally support the conclusion that even if, as Westinghouse contends, it supplied all the necessary information through alternative sources, and such action amounted to a constructive change,[46] that change was cardinal. The court is also of the belief that even if the furnishing of information by alternative methods could be characterized as a change, it would not be a change "in or to drawings, designs, specifications, [or] instructions for work."

Taking these three approaches in reverse order, it is patent that substituted sources of information do not constitute a change in or to specifications. The court also believes

442–43, 181 Ct.Cl. 29 (1967). The court agrees with Westinghouse that the change *sub judice* would qualify as a constructive change if it were within the scope of the clause. For a viewpoint advocating abandonment of the con-

structive change doctrine *see* Gusman, "Constructive Change"—A Theory Labelled Wrongly, 6 Pub. Contracts L.J. 229 (1974).

**46.** Note 45 *supra.*

that this substitution would not be a change in or to drawings or designs because in order for there to be a change in something it obviously must pre-exist the change. Here the drawings for which alternate information sources were substituted never existed. Finally, the substitution was not in or to instructions for work as this court understands that term.

Even if this substitution were a change in instructions for work, or in one of the other express designations, there would be a breach of contract because such a change can only be characterized as cardinal. While it may be true, as Westinghouse argues, that source control drawings are principally just a format, they are a format of considerable significance. There are important differences between the nature of a vendor's work where it has source control drawings to work from and where it does not. The existence of source control drawings in conjunction with a specification such as the PDS represents the attainment of a certain plateau in the development of a system. It represents a certain stabilization upon which the vendor has a right to rely. [Tr. 1393–94]. The existence of SCD's suggests that changes will be fewer in number and of less impact than might otherwise be expected. Moreover, when changes do occur SCD's provide a "base line" [Tr. 3523] or single reference point from which to work. Changes thus complicate the work much less when the vendor works from SCD's than when it works from piecemeal information derived from a myriad of sources, as was the case here.

That Garrett was relying on the fact that SCD's would be forthcoming at the same time as the final PDS or shortly thereafter is borne out by numerous facts in this case. Foremost among these is that Garrett had bid to the R–Spec for the 20-lot contract. The R–Spec contained no provision for source control drawings. [D. 339; Tr. 783]. The addition of SCD's to the PDS plus the quantity increase to the typically production-lot size of 250 systems reasonably suggested to Garrett that development had progressed satisfactorily and was reasonably stable. With the concededly short delivery schedule added to this equation, it becomes apparent that Garrett had every right to rely on the representation in the PDS that SCD's would be seasonably supplied. Garrett's repeated demands for the SCD's accents its expectation.

Failure to provide SCD's, even if adequate alternative sources of information were made available, thus fundamentally altered the nature of Garrett's undertaking. Having SCD's to work from was in some sense the basis of Garrett's bargain. Garrett was entitled to the ease of working from a single source of information and to the facilitation of incorporating otherwise disruptive changes that comes from having such a source or "base line." On a contract with a delivery schedule as tight as that at issue, source control drawings become critical and any non-identical substitution becomes fundamental; it goes to the heart of the vendor's undertaking. *See, e. g., Edward R. Marden Corp. v. United States,* 442 F.2d at 369–70; *cf. Embassy Moving & Storage Co. v. United States,* 424 F.2d 602, 607, 191 Ct.Cl. 537 (1970) (changes in place of delivery ordinarily within Changes Clause, but where subject matter of contract is delivery to certain place, change in location deemed fundamental).

As noted above, the court's principal ground for holding that the failure seasonably to provide source control drawings was a breach by Westinghouse is that the failure was not a change at all but a breach in the first instance. Westinghouse does not argue, and there is no proof, that it ever informed Garrett that source control drawings would not be seasonably forthcoming. The proof in fact is to the contrary. Garrett argues that the drawings were promised within a week of the May 17–19 negotiations. In opposition, Westinghouse argues only that there was no one-week promise, but not that Westinghouse ever represented that the drawings would not be forthcoming, at least within the commercially reasonable time implied into the contract by

**1334**

law. *Code*, § 2–309(1) & Comment 1; § 1–204; § 2–103(4).

The court is of the opinion that furnishing the drawings on July 26, 1971 was not commercially reasonable. Westinghouse knew or should have known that Garrett expected to work from the source control drawings, not to use them merely as final checklists. The delivery schedule was "extremely tight" and time was of the essence. Furthermore, the evidence indicates that had Garrett not called the July 21, 1971 meeting it would not have received the SCD's even when it did. Whelan's July vacation reinforces this belief. Westinghouse operated in virtual disregard of its contractual undertaking. The court holds that not providing any of the five required source control drawings until and after late June, when three were supplied in preliminary form, and not providing the other two in any form until final source control drawings were at last supplied on July 26, 1971 constituted a failure on the part of Westinghouse to perform its contractual obligation in a commercially reasonable time. The court further holds that this failure was a breach and not a change. *National Steel & Shipbuilding Co. v. United States*, 419 F.2d 863, 867, 871–72, 190 Ct.Cl. 247 (1969); *Peter Kiewit Sons' Co. v. United States*, 151 F.Supp. 726, 731–33, 138 Ct.Cl. 668 (1957) (en banc).

### V.

### *Default Termination*

The question then becomes that of the effect of Westinghouse's breach on its right to terminate Garrett for default. If the appropriate clauses are in the contract, as they are here, a wrongful default termination may become a termination for convenience entitling the terminated party to recover its costs as set forth in the convenience termination clause. Garrett seeks by its counterclaim in this case to have its termination by Westinghouse converted to one of convenience, entitling it to recover the costs allowed in such cases.

A prior breach by the terminating party may, but need not, prevent it from terminating the other party for default. *Litchfield Manufacturing Corp. v. United States*, 338 F.2d 94, 97–98, 167 Ct.Cl. 604 (1964). Conversely, a prior breach by the terminating party may, but need not, permit the terminated party to recover for a convenience termination. *See* Part VII, *infra*. Hence an inquiry is necessary into the nature, effect, and interrelationship of Westinghouse's breach and Garrett's alleged default.

The instant contract incorporates with certain modifications a default termination clause from the Armed Services Procurement Regulations, in particular, 32 C.F.R. § 8.707, as in effect at the time of the contract.[47] [P. 35, ¶ 12]. Several circumstances justifying default termination are enumerated. Relevant to the present contract is that provision enabling default terminations when the vendor "so fails to make progress as to endanger performance of this contract in accordance with its

---

**47.** The incorporated clause, with modifications, reads as follows:

(a) The Government may, subject to the provisions of paragraph (c) below, by written notice of default to the Contractor, terminate the whole or any part of this contract in any one of the following circumstances:

(i) If the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof; or

(ii) If the Contractor fails to perform any of the other provisions of this contract, or so fails to make progress as to endanger performance of this contract in accordance with its terms, and in either of these two circumstances does

not cure such failure within a period of 10 days (or such longer period as the Contracting Officer may authorize in writing) after receipt of notice from the Contracting Officer specifying such failure.

(b) In the event the Government terminates this contract in whole or in part as provided in paragraph (a) of this clause, the Government may procure, upon such terms and in such manner as the Contracting Officer may deem appropriate, supplies or services similar to those so terminated, and the Contractor shall be liable to the Government for any excess costs for such similar supplies or services: *Provided*, That the Contractor shall continue the performance of this contract to the extent not terminated under the provisions of this clause.

terms." If there has been such a failure *and* the seller "does not cure such failure within a period of 10 days (or such longer period as the [buyer] may authorize in writing) after receipt of notice from the [buyer] specifying such failure" the buyer may terminate for default.

By July 29, when Westinghouse issued its show cause (or "cure") notice to Garrett, Westinghouse had ample reason to believe Garrett had so failed to make progress as to endanger performance. It is undisputed that as of July 21 it was clear to both parties that Garrett would not meet the original delivery schedule. Although Westinghouse personnel were aware of some fault on their part, they believed that their failure to furnish final SCD's and their imposition of certain changes had had a minimal effect on delivery; they believed the bulk of the fault lay with Garrett. Garrett's hastily-called meeting on July 21 and its proposal of a design change and forewarning of a cost increase added to Westinghouse's concern. Moreover, Garrett had not yet held or sought a design review meeting which meant to Westinghouse that fabrication could not be imminent.

Then on July 22 Garrett notified Westinghouse that it had placed an internal hold on production and procurement. Westinghouse personnel believed Garrett had a duty to proceed under the Changes

(c) Except with respect to defaults of subcontractors, the Contractor shall not be liable for any excess costs if the failure to perform the contract arises out of causes beyond the control and without the fault or negligence of the Contractor. Such causes may include, but are not restricted to, acts of God or of the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather; but in every case the failure to perform must be beyond the control and without the fault or negligence of the Contractor. If the failure to perform is caused by the default of a subcontractor, and if such default arises out of causes beyond the control of both the Contractor and subcontractor, and without the fault or negligence of either of them, the Contractor shall not be liable for any excess costs for failure to perform, unless the supplies or services to be furnished by the subcontractor were obtainable from other sources in sufficient time to permit the Contractor to meet the required delivery schedule.

(d) If this contract is terminated as provided in paragraph (a) of this clause, the Government, in addition to any other rights provided in this clause, may require the Contractor to transfer title and deliver to the Government, in the manner and to the extent directed by the Contracting Officer, (i) any completed supplies, and (ii) such partially completed supplies and materials, parts, tools, dies, jigs, fixtures, plans, drawings, information, and contract rights (hereinafter called "manufacturing materials") as the Contractor has specifically produced or specifically acquired for the performance of such part of this contract as has been terminated; and the Contractor shall, upon direction of the Contracting Officer, protect and preserve property in the possession of the Contractor in which the Government has an interest. Payment for completed supplies delivered to and accepted by the Government shall be at the contract price. Payment for manufacturing materials delivered to and accepted by the Government and for the protection and preservation of property shall be in an amount agreed upon by the Contracting Officer. . . .

(e) If, after notice of termination of this contract under the provisions of this clause, it is determined for any reason that the Contractor was not in default under the provisions of this clause, the rights and obligations of the parties shall, if the contract contains a clause providing for termination for convenience of the Government, be the same as if the notice of termination had been issued pursuant to such clause. If, after notice of termination of this contract under the provisions of this clause, it is determined for any reason that the Contractor was not in default under the provisions of this clause, and if this contract does not contain a clause providing for termination for convenience of the Government, the contract shall be equitably adjusted to compensate for such termination and the contract modified accordingly; failure to agree to any such adjustment shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled "Disputes".

(f) The rights and remedies of the Government provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this contract.

In subparagraphs (a), (b), (d), (e), and (f) "the term Contractor [is] deemed to mean Seller; Government and Contracting Officer [are] deemed to mean Buyer." In subparagraph (c) "the term Contractor [is] deemed to mean Seller, the term Government . . . mean[s] the Government of the United States. P. 35, ¶ 12.

Clause which it was thereby violating. Westinghouse requested Garrett to document the various changes and other acts by Westinghouse which Garrett believed had impacted cost and delivery together with a statement of what those impacts were. Such documentation was not forthcoming and Westinghouse, believing the contract was in jeopardy and termination likely, made arrangements to reprocure and sent Garrett a show cause notice. No further progress appearing, Westinghouse ten days later ordered Garrett to stop work. A day or two thereafter Garrett proposed a sixteen week delivery schedule *after* already having final SCD's in hand and *after* having worked on the project for nine weeks and despite the fact that the original schedule called for delivery in fourteen weeks with final SCD's to be in hand, according to Garrett, one week after the May 17–19 meeting. Had Westinghouse timely supplied the SCD's there is no question that a default termination would be proper.[48]

■ But Westinghouse did not timely supply the SCD's. And although Westinghouse argues that it gave sufficient alternative information, the facts are otherwise under the peculiar circumstances of this contract. That is, the information supplied may have been adequate for a contract with a substantially longer lead time prior to first delivery—for example, twenty to twenty-five weeks—but it was not adequate for a ninety-seven day contract. The tightness of this delivery schedule, known to *both* parties, required Westinghouse to furnish both preliminary and final SCD's substantially sooner than it did.

Westinghouse admitted in response to Brooks' June 11 TWX first advising Westinghouse of a day for day impact pending receipt of the SCD's that the information Westinghouse was then furnishing was *"essentially . . . the majority"* of the

---

**48.** The court thus rejects *in toto* defendant's argument that the default termination was somehow procedurally improper. Had plaintiff timely supplied the SCD's, defendant's acts would certainly have justified the sending of the show cause notice and the ultimate default termination. Moreover, the notice actually sent fulfills the requisites of a show cause notice under the default termination clause; the termination itself was likewise sufficient.

The court also rejects defendant's contention that the default termination was improper because Westinghouse decided to fabricate cooling systems for the 281-lot prime contract in-house and decided to procure some from UAP *prior* to terminating Garrett. The court deems this argument irrelevant. It is to be expected that Westinghouse, with a binding commitment to the Air Force, would secure alternate sources before terminating Garrett. Moreover, Garrett remained protected by its contract; if wrongfully terminated it could recover. Fox evidenced his awareness of these considerations in his testimony, suggesting that if Garrett satisfied Westinghouse's insecurities UAP could be terminated for convenience before running up many costs. And if UAP ran up too many costs to justify termination, its production could be used to satisfy the requirements of anticipated follow-on contracts with the Air Force.

Garrett also argues that the numerous Westinghouse-imposed changes contributed to its delay and hence prevented Westinghouse from terminating Garrett for default. This argument is largely useless to Garrett given its August 11 proposal to deliver completed cooling systems sixteen weeks after receipt of an authorization to proceed. Garrett has failed to prove that the Westinghouse-imposed changes made Garrett's undertaking any more difficult *than it was at the outset*. Accordingly, there is no justification for Garrett requesting 14% more time than it originally quoted, essentially to start all over, and especially to start over at an advanced stage, as Garrett's new quotation stated—after resolution of all engineering difficulties and clarification of the final SCD's. Moreover, Garrett has failed to explain what happened to the nine weeks (up to July 21) of actual progress under the contract.

It should be noted that these Westinghouse-imposed changes *were* within the Changes Clause and would have entitled Garrett to equitable adjustments therefor. Garrett had a duty to proceed in spite of these changes, however, and they cannot be used to justify Garrett's internal hold, the propriety of which depends solely upon the SCD issue.

Lastly, were the amount of excusable delay caused by these changes relevant to the outcome of this case, the court is of the opinion that Garrett proved its entitlement to no more than the six-week slip projected at the July 21 meeting.

information necessary to *sustain*[49] the design effort." [P. 52] (emphasis and footnote added). The court holds this information was insufficient in the context of the instant contract, given the timetable and Garrett's reasonable expectation that the drawings would be forthcoming in time to work *from* them, not to check its work *against* them. The lack of drawings (a) forced Garrett to check repeatedly with Westinghouse for envelope and interface information, (b) caused Garrett to make errors that might have been inexcusable with the drawings, but were certainly excusable without, and (c) forced Garrett to work inefficiently with a myriad of piecemeal information sources and no technical baseline, all of which resulted in substantial design delays and redesign time.[50]

The inefficiency of it all is pointed out by Westinghouse's own problems with the drawings. When the various preliminary drawings were supplied around the end of June and the finals near the end of July they were replete with mistakes directly attributable to the piecemeal information system. One of their principal faults was that they contained information that had since been changed; for example, the preliminaries contained UAP dimensions that had been changed and the finals contained both UAP and preliminary SCD information that has since been changed.

Thus, when the July 21 meeting and subsequent events came around, Westinghouse had contributed substantially to Garrett's problems and hence to its own insecurity. Garrett's internal hold was a reasonable and prudent decision in the face of its problems and Legin's representation that final SCD's would be shortly forthcoming. *See Remm Company*, 74–2 BCA ¶ 10,876 (ASBCA 1974) at 51,766–67. If Garrett's internal hold caused Westinghouse insecurity, it was partly Westinghouse's own fault. The same is true of Garrett's failure to remove its hold after receipt of the Westinghouse drawings while it compared the information provided with the information it had; the inaccuracies Garrett had found in the preliminary drawings certainly justified the continued hold pending review of the final drawings. Moreover, Garrett could not begin the review until July 26, and there is no proof the review was completed before July 29 when Westinghouse ordered Garrett to stop all work, rendering removal of Garrett's internal hold irrelevant. The court concludes that Westinghouse's termination of Garrett for default was not sufficiently inseparable from its failure to provide SCD's in a timely fashion to permit Westinghouse a default termination recovery.[51] *See Dynalectron Corp. v. United States*, 518 F.2d 594, 602 (Ct.Cl.1975); *Litchfield Manufacturing*

49. The court notes the use of the word "sustain" as opposed to "complete."

50. Furthermore, had Westinghouse begun preparing SCD's by the time of the May meetings a number of Westinghouse's later-imposed changes might have been obviated. That is, if Westinghouse had already begun mapping out final dimensional information, items later needing change might have been discovered and Garrett would have had better information from the outset.

51. Although relevant, the court finds unpersuasive Westinghouse's argument that because Garrett made substantial progress despite Westinghouse's lure to furnish the SCD's, Westinghouse's contributory fault is illusory. First, the court is not convinced that Garrett's progress was quite that substantial. Second, no matter how substantial the progress, Garrett's refusal to manufacture without design review approval and failure to hold a design review without final SCD's strikes the court as more reasonable than scheduling a design review and obtaining approval to manufacture something that might not be quite right once the final drawings were prepared. Although having approval would relieve Garrett of liability for failure to comply with its contractual warranty to conform to the PDS (and to the final SCD's which are a part thereof), the burden should not be on Garrett to initiate such a procedure. Westinghouse should have demanded a design review and waived compliance with the final SCD's. Finally, substantial progress, indeed, even timely completion by Garrett does not absolve Westinghouse of liability for failure to comply with its contractual obligations. *See National Steel and Shipbuilding Co. v. United States*, 419 F.2d at 901.

*Corp. v. United States, supra; Peter Kiewit Sons' Co. v. United States, supra; General Metals, Inc. v. Green Fuel Economizer Co.,* 213 F.Supp. 641 (D.Md.1963) (Thomsen, J.).[52]

Lastly, the court is disturbed by the cavalier approach to the source control drawings taken by Westinghouse. When Garrett finally reached high enough in the Westinghouse hierachy—to Legin, on July 21—final source control drawings were forthcoming in two days. But those charged with the more immediate responsibilities on the contract were unconcerned; they had decided in their own minds that what they were giving Garrett was sufficient and, in effect, "that was that," despite Garrett's repeated demands for the drawings and Westinghouse's contractual obligation to supply them. It is one thing after the fact and having had no objection to say one has substantially performed, or has performed the equivalent, of one's contractual obligation. It is quite another thing to virtually ignore what one has promised the other party in the face of repeated demands for the thing actually promised. "[Westinghouse] has no right to set up, as to [Garrett], something which, it claims is the

equivalent of, or practically as good as, the thing which it had expressly agreed that [Garrett] should have." *California Electric Power Co. v. United States,* 60 F.Supp. 344, 357, 104 Ct.Cl. 289 (1945).[53]

## VI.

### *Anticipatory Breach*

Westinghouse argues that the same facts marshalled in support of a default termination entitled it to terminate Garrett for anticipatory breach under the Uniform Commercial Code. *Code,* § 2–610. In particular Westinghouse argues that Garrett gave it ample grounds for insecurity, that the July 29 show cause notice was a demand for adequate assurances, that such assurances were not forthcoming, and that this failure entitled Westinghouse to treat the contract as repudiated. *Id.,* § 2–609.

This approach suffers from the same fatal flaw as the default termination approach. The prior breach by Westinghouse so contributed to the facts giving rise to the purported insecurity as to estop Westinghouse from demanding adequate assurances. It is manifestly unreasonable to require a party to give assurances that he will

---

**52.** "One who himself induces the failure of the other to perform within the time agreed upon cannot take advantage of such failure, either by enforcing a prescribed penalty or forfeiture, or by claiming damages for breach." 213 F.Supp. at 652–53.

**53.** As the Court of Claims stated in a related context:

[T]he . . . failure to supply . . . detail drawings as needed . . . was an act of omission which was a breach of contract. . . . There is nothing in the record to show why these drawings should not have been prepared and delivered on time. It is true that some 2500 detail drawings were involved, but when . . . notice to proceed [was given], they had every right to expect timely delivery of the drawings in order to enable them to perform as required and the . . . failure is a breach . . . The mere volume of work involved is not an adequate reason for excusing . . . liability for [this] failure.

*Peter Kiewit Sons' Co. v. United States,* 151 F.Supp. at 733.

The court is mindful of the policy behind the changes clause in Government contracts. By requiring the contractor to proceed despite changes the Government may adapt its contracts to achieve the exigencies of the moment. The contractor is, of course, later compensated for the changes, but in the meantime the Government obtains what it needs.

There is a countervailing policy at stake in this case, namely, the integrity of contractual undertakings. Westinghouse having promised certain drawings and Garrett having a right to those drawings and having demanded them, it would be inimical to the integrity of the contractual process to allow Westinghouse to escape its undertaking by hiding behind the rubric of the Changes Clause. The Changes Clause is not an absolute excuse for the Government—or an adopting prime contractor—to avoid the consequences of breach. The courts have made this clear over and over—in the adoption of the cardinal change rule and in the cases finding outright breach. Examples abound; many are cited in Part IV of the *DISCUSSION* section, *supra.*

overcome the requesting party's breach. Moreover, Garrett never stated that it would not perform the contract and repeatedly held to the contrary. Although Garrett's sixteen week proposal on August 11 might have justifiably been treated as an anticipatory breach under different circumstances, it cannot be sufficiently divorced from Westinghouse's failure to supply SCD's to justify permitting Westinghouse to recover. *See, e. g., Griffith v. Scheungrab,* 219 Md. 27, 146 A.2d 864, 867–68 (1959);[54] *General Metals, Inc. v. Green Fuel Economizer Co., supra. See also LeRoy Dyal Co. v. Allen,* 161 F.2d 152, 155 (4th Cir. 1947).

## VII.

### Garrett's Counterclaim

Generally an improper default termination converts automatically to a termination for convenience,[55] entitling the terminated party to recover its costs. In this case, however, the court finds that such a result would be grossly inequitable. If the trial of this case left the court with any single overwhelming impression, it was that of mutual fault. Much as Westinghouse's fault prevents it from recovering for a default termination, the court believes that Garrett's fault should prevent it from recovering for a convenience termination.

There is support for this result in the language of the contract itself, which converts not every improper default termination into a convenience termination, but only (a) those in which there is in fact no default, and (b) those which occur without the fault or negligence of the terminated party.[56] In the present case there was an impending default and it was due at least in part to Garrett—for example, the failure to pursue the UAP ASHX design and the corresponding four week slippage. Thus, neither of the two excuses which automatically convert an improper default termination into one for convenience is present here. The instant default termination is improper not under the express terms of the contract, but under a term implied by law, intrinsic to the very nature of contractual relationships: the duty of every contracting party to fulfill its commitments according to the terms of its undertaking. The instant default termination was improper for this extra-contractual reason and not for either of the contractual reasons expressly converting default terminations into convenience terminations. Hence Garrett cannot recover for a convenience termination and the parties are left to absorb their respective losses.

54. "Where the cooperation of a promisee is necessary for the performance of a promise, there is a condition implied in fact that the cooperation will be given . . . . Where a contractual duty is subject to a condition precedent, whether express or implied, there is no duty of performance and there can be no breach by nonperformance until the condition precedent is either performed or excused. An unexcused failure to perform makes it impossible for a breach to occur and, therefore, no remedy for enforcement is available to the delinquent one." 146 A.2d at 868.

55. Subparagraph (e) of the standard default termination clause, including the one contained in the instant contract, provides that if "it is determined for any reason that the Contractor was not in default under the provisions of this clause, or that the default was excusable under the provisions of this clause, the rights and obligations of the parties shall, if the contract contains a clause providing for termination for convenience of the Government, be the same as if the termination had been issued pursuant to such clause." The instant contract incorporates by reference ASPR § 8–706, 32 C.R.F. § 8–706, which has been construed to be a convenience termination clause, *Universal Fiberglass Corp. v. United States,* 537 F.2d 400 (Ct.Cl.1976), and which, by the language of the contract, the parties clearly intended as such. P. 35, ¶ 11.

56. The Default Termination Clause provides that the seller may escape the consequences of a default termination if "it is determined for any reason [i] that the [seller] was not in default under the provisions of this clause, or [ii] that the default was excusable under the provisions of this clause." Subparagraph (c) of the clause excuses default "if the failure to perform the contract arises out of causes beyond the control and without the fault or negligence of the [seller]." *See* note 47, *supra.*

The courts have not been loath to reach similar results in other cases of mutual fault, including one case where termination for convenience should have been automatic, but the Court of Claims decided such a result would be inequitable, failing to take proper account of the fault on both sides. *Dynalectron Corp. v. United States, supra.* And in *General Metals, Inc. v. Green Fuel Economizer Co., supra,* although not involving conversion of default termination to convenience, it was held by Judge Thomsen of this court that neither party to a terminated contract could recover from the other because of mutual fault and the failure of each party to prove it was without fault. *Id.,* at 653. The court believes the instant case is an appropriate one for the application of similar principles and holds that neither Westinghouse nor Garrett can recover on the facts and proof in this case.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over this action in that the parties are of diverse citizenship and the amount in controversy, exclusive of interest and costs, exceeds $10,-000. 28 U.S.C. § 1332.

2. During meetings at Westinghouse on May 17–19, 1971, Garrett and Westinghouse contracted for Garrett to design, manufacture, test and deliver 250 cooling systems to be incorporated by Westinghouse into ECM pods it was producing for the United States Air Force under the QRC–522 program.

3. The essential terms of that agreement—price, quantity, delivery and technical specifications—were all fixed at the May meetings.

4. Westinghouse was contractually obligated to deliver final source control drawings to Garrett.

5. The delivery of final source control drawings to Garrett on July 23 was not (a) in good faith on the part of Westinghouse, (b) within limits set by commercial reasonableness, and (c) seasonably made.

6. The failure of Westinghouse to deliver final source control drawings to Garrett before July 23 materially affected the timely performance of the subcontract by Garrett.

7. Since time was expressly made of the essence of the contract, the failure of Westinghouse to deliver final source control drawings seasonably or as agreed constituted (a) a material breach of the subcontract, and (b) a failure of a condition precedent to Westinghouse's right to require counterperformance by Garrett.

8. Under these circumstances, Westinghouse could not properly terminate Garrett for default and may not recover its excess procurement costs.

9. Garrett was equally at fault in the events leading to the termination of this contract.

10. Under these circumstances, Garrett may not properly have its termination converted to one for convenience and may not recover its costs.

Judgment to be entered accordingly.[57]

---

**57.** In order to complete the record the following exhibits, upon which ruling was reserved at trial, are hereby admitted:

D. 135, 189B, 189C, 227, 239, 261, 264, 418, 425, 426A, 426B, 427, 428, 429, 430, 432, 433, 434, and 435.